KELLUM v. CORR et al.

(Supreme Court, Appellate Division, Second Department. February 16, 1912.)

1. PARTITION (§ 20*)—EFFECT OF ADVERSE POSSESSION.
    A partition suit may be maintained, though the premises are held adversely, and the right, title, and interest of the adverse holder determined as an incident to the main relief.
    [Ed. Note.—For other cases, see Partition, Cent. Dig. §§ 65–67; Dec. Dig. § 20.*]

2. APPEAL AND ERROR (§ 1099*)—SUBSEQUENT APPEALS—SCOPE AND EXTENT OF REVIEW.
    The reversal of a judgment on the specific point of exclusion of evidence does not determine that the court considered all other points of attack untenable.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4370–4379; Dec. Dig. § 1099.*]

3. APPEAL AND ERROR (§ 1099*)—SUBSEQUENT APPEALS—SCOPE AND EXTENT OF REVIEW.
    Where there was a directed verdict below with a direction that the exceptions should be first heard on appeal, a judgment entered upon the overruling of the exceptions, which was vacated on payment of costs under a statutory right for a new trial, is not res judicata as to the issues.
    [Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1099.*]

4. ADVERSE POSSESSION (§ 104*)—PRESUMPTION OF GRANT.
    To presume a lost grant, circumstances need not be proved which indicate the probability of its making; but it is sufficient if a possibility of an actual grant be shown.
    [Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

5. ADVERSE POSSESSION (§ 104*)—PRESUMPTION OF GRANT.
    The presumption of title under a lost grant will not be indulged except where there has been such open and actual possession in the pre-

sumed grantee ·as to indicate exclusive ownership, continuing over 20 years, the statutory period for adverse possession to ripen into title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

6. APPEAL AND ERROR (§ 1099*)—SUBSEQUENT APPEAL.
A determination that facts were not sufficient to show possession which was adverse nor form a basis upon which to rest a presumption of lost grant is binding upon the showing of the same facts on a subsequent appeal.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1099.*]

7. ADVERSE POSSESSION (§ 43*)—CONTINUITY OF POSSESSION—TACKING SUCCESSIVE POSSESSIONS.
Where an adverse possessor has been ousted by a hostile holder, possession after a recovery of the premises cannot be tacked to the prior possession to fill out the 20-year period required for adverse possession to ripen into title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 213–225; Dec. Dig. § 43.*]

Appeal from Special Term, Queens County.

Partition by Cornelia Kellum against Alice J. Corr and others. The Mission of the Immaculate Virgin for the Protection of Homeless and Destitute Children impleaded. From an interlocutory judgment determining the rights of the parties, the impleader appeals. Affirmed.

See, also, 129 App. Div. 921, ·114 N. Y. Supp. 1132.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

Austen G. Fox (Theodore De Witt, on the brief), for appellant.
Charles S. Noyes, for respondents.

PER CURIAM. This is an appeal from an interlocutory judgment in an action of partition, which defined the respective rights in the land in question that were vested in various of the parties to the action. The land is situated at Rockaway Beach, in Queens county. The complaint sets forth the alleged title of the plaintiff and the titles and the respective interests of the various defendants. It was claimed in the complaint that the defendant Mission of the Immaculate Virgin was in possession of the larger part of the premises described therein, and held the same adversely, but without legal title or interest thereon as against the plaintiff and the other defendants, and a judgment was asked declaring the said defendant to be without legal right or title to the premises sought to be partitioned. The defendant Mission of the Immaculate Virgin set up a claim of title adverse to that of the plaintiff and the other defendants, and asks for a dismissal of the complaint. No issues of fact were framed for trial by a jury, but a stipulation was entered into by all the parties to the action, consenting to the entry of an order appointing David B. Ogden, Esq., referee to hear and determine. After taking the voluminous proofs which appear in the record on this appeal, the learned referee wrote a somewhat elaborate opinion, in which he held that the defendant Mission of the Immaculate Virgin had no title or interest in the premises in question, and directed judgment accordingly. After the filing of this

opinion, very extensive findings of fact were made by the referee on the request of the plaintiff, and somewhat extensive requests to find made by the defendant Mission of the Immaculate Virgin were passed upon by the referee. Judgment was entered in accordance with the findings of the referee in favor of the plaintiff, and from this interlocutory judgment the defendant Mission of the Immaculate Virgin has appealed to this court.

[1] The last question discussed in the somewhat elaborate brief of the appellant is the first question that should be considered in order. It is urged by the appellant that the right, title, and interest of the defendant Mission of the Immaculate Virgin, which was in adverse possession of the premises in question, as against all other parties to the action, could not be determined properly in an action of partition, and that therefore the complaint should have been dismissed. There are numerous decisions of recent date, some of which had been made by this court, in which it has been held that an action in partition may be maintained even when the premises are held adversely, and that the right, title, and interest of the adverse holder may be determined in such an action as an incident to the main relief of partition. Lawrence v. Norton, 116 App. Div. 896, 102 N. Y. Supp. 481; Leidenthal v. Leidenthal, 121 App. Div. 269, 105 N. Y. Supp. 807; Johnson v. Aleshire, 130 App. Div. 178, 114 N. Y. Supp. 398.

Whatever title the parties to this action may possess originated in a common source of title. The land in question had been covered by a partition action in Queens county, which was brought in 1809, and which is generally referred to throughout the record as the Cornwell partition action. This land was owned originally by parties named Cornwell and a party named Josiah Martin. Josiah Martin died long prior to 1809, and devised his interest in the land to his son Samuel Martin, who likewise died prior to 1809. Samuel Martin devised all his real estate to his two sisters, Alice Martin and Rachel Banister. In the partition action of 1809, an actual partition was had of the real estate covered by the suit. In that action, it was adjudged that Rachel Banister and her husband, Thomas Banister, were seised of two undivided sixteenth parts of the property in question, and that Alice Martin was seised of a like interest. Commissioners were appointed to make actual partition, and maps were prepared and acted upon by said commissioners. The land covered by this ancient action was situated at Rockaway Beach, and consisted of beach land and marsh land. The commissioners on their maps divided the beach land into two divisions, which they called the first and second divisions of the beach. These divisions were again subdivided into plots, which were numbered respectively. In the actual partition made by the commissioners, Rachel and Thomas Banister were awarded lots 6 and 7 in the first division of the beach, and lots 4 and 5 in the second division of the beach. These lots 4 and 5 of the second division of the beach embrace the land in controversy in this action. Alice Martin was allotted lots 4 and 14 of the first division of the beach, and lots 12 and 13 of the second division of the beach, and other land known as lots 13 and 14 of the division of the marsh, etc.

The plaintiff in this action, and the other defendants excluding the defendant Mission of the Immaculate Virgin, claim title to the land in question as descendants of or successors in interest of Rachel Banister, to whom an allotment was made in 1809. So far as the question of descent is concerned, or succession by mesne conveyances, there is no controversy in the case.

While there is a very elaborate presentation of the controversy in the respective briefs, it may be stated summarily as follows: The plaintiff claims that she and her cotenants have made out a prima facie case by showing title in Rachel Banister, and descent or succession from her. The appellant claims that it has made out a title by showing an intermediate acquisition, either by actual grant or by presumption of grant from Rachel Banister, deceased. When the plaintiff rested in her proofs, she had made out concededly a prima facie title by descent from Rachel Banister. The appellant contends, however, that the proofs given by it on the defense established either an absolute title in itself from the original source of title, or show such circumstances as to create a presumption in law that the plaintiff's alleged predecessors in title had in the course of time by grant or otherwise become divested of all title in the premises, and that therefore the plaintiff and her alleged cotenants were without legal right to maintain the present action as against the appellant, which was in actual possession of a greater part of said premises under a hostile claim of title.

The controversy as to the title to this land has been before the courts quite frequently and in various forms.

The respondents contend that all the questions of law involved in the issues have been settled against the appellants by the decisions in the following cases: Mission of the Immaculate Virgin v. Cronin, 143 N. Y. 524, 38 N. E. 964; Kellum v. Mission of Immaculate Virgin, 82 App. Div. 523, 81 N. Y. Supp. 603; Kellum v. Mission of the Immaculate Virgin, 129 App. Div. 921, 114 N. Y. Supp. 1132.

Before passing to a consideration of the merits of this appeal, the effect of these prior decisions should be considered briefly. The Cronin Case is authoritative on several important branches of the present action, but does not cover it entirely for the reason that there is now before the court proof of a series of facts which were not then in evidence or under consideration in any way.

That action was one in ejectment in which the then plaintiff had to rely upon its own proofs of title, and it was held that such proofs as it had offered did not make out title either by actual grant or presumption of a lost grant, or by adverse possession. Kellum v. Mission was likewise an action in ejectment, and on the first trial thereof before a jury a verdict was directed against the defendant and judgment entered accordingly. On an appeal to this court that judgment was reversed, on the specific ground of an error of the trial court in the exclusion of evidence.

[2] The reversal of a judgment on one specific point does not mean that the appellate court has considered all other points of attack untenable. On the second trial of the Kellum ejectment action, a verdict in favor of the plaintiff was again directed by the trial court with

a direction that the exceptions should be heard in the first instance in this court. On the hearing of the exceptions in this court, they were overruled, and judgment was directed for the plaintiff. 129 App. Div. 921, 114 N. Y. Supp. 1132. No opinion was written, however.

[3] The judgment so entered was vacated on payment of costs by the defendant under its then statutory right for a new trial in an ejectment action, and it does not constitute res adjudicata as to the issues. Doubtless, so far as the same questions of law are involved, it should be considered as decisive as to the "law of the case." An examination of the record on appeal in that case and a comparison of them with the record in this case shows that the proofs are very largely the same. It is urged, however, by the appellant here, that the proofs of the Mission in the former case have been supplemented in this action by additional proofs of great importance to such extent as to present the controversy in this action in a somewhat fresh aspect. Whether this be so, the learned referee proceeded to consider and determine the case without regard to any decisive effect of the decisions in the Kellum ejectment action, and in considering this appeal we shall do the same.

Whatever record title the appellant has came by grant from Charles Donohue and wife by deed dated January 6, 1881. Charles Donohue was the grantee in a deed executed by Benjamin C. Lockwood and others, dated January 28, 1869. This last deed recited that the grantors were the widow and son and only heir at law of Benjamin C. Lockwood, deceased. The instrument further recited that the land described therein was formerly owned by Benjamin Cornell and that he devised the same by his will to his grandson Benjamin C. Lockwood, deceased. It appears in the proofs that this Benjamin C. Lockwood, the elder, died on October 19, 1838. The recital in this deed as to the source of Benjamin C. Lockwood's title through a will of Benjamin Cornell is apparently unsupported by any proofs; for, as it appears in this record, if he ever acquired any title to these lands, it must have been under a deed to him from Robert Bogardus and James Foster as trustees, dated March 12, 1832. The description in this last-mentioned deed describes the land conveyed as beach lots 6 and 7, but also contains general words of location which the appellant contends would relate really to beach lots 4 and 5 and thus make the deed applicable to the lands in controversy by the exclusion of the numbers of the beach lots as expressed in the deed as being mere clerical errors. Bogardus and Foster made their grant expressly under the powers given to them by a certain trust deed from Thomas Banister and others. Here comes the crucial point of controversy in this case. Did this trust deed embrace the lands now in controversy? The appellant contends that it did, while the judgment below is based upon the theory that it did not.

The Thomas Banister of the trust deed was the husband of Rachel Banister of the partition action of 1809, who was the allottee of beach lots 4 and 5. The other grantors were children of Rachel Banister, then deceased. The fee to beach lots 4 and 5 was in some of these grantors in undivided shares, and the right of possession of the

whole of the premises was in Thomas Banister as tenant by curtesy. The question is: Did they convey this beach land in their deed to Bogardus and Foster as trustees? This trust deed is dated July 24, 1818. The land conveyed is described therein as follows:

"All that certain farm, mansion house, outhouses, woodland, meadow, ground and premises situate, lying and being at Far Rockaway, in the township of Hempstead, county of Queens and state of New York, commonly called Rock Hall, including the piece of land purchased from Whithead Cornell, the piece purchased from Stephen Wood, the piece purchased from Micajah Mott and the piece purchased from James Abrams, and whereof Samuel Martin, late of Rockaway, aforesaid, physician, died seised. Containing in the whole by estimation four hundred acres of land, all of which the said Samuel Martin devised to his two sisters, Rachel Banister, the wife of the said Thomas, and Alice Martin, deceased, the undivided moiety which belonged to the said Alice Martin was by deed duly executed and bearing date the twelfth day of September, one thousand eight hundred and seventeen, conveyed to the said Thomas by Robert Bogardus and Allice McNeil, in virtue of will of the said Alice Martin and to which will they were executors."

There was a well-known estate or farm known as Rock Hall, which was situate over two miles away from beach lots 4 and 5, and which was not embraced within the Cornwell partition of 1809, as it was not owned in common by the parties to that action. This trust deed recites the purposes of the trust. It recites also that Thomas Banister is seised in fee of an equal undivided moiety of the lands described therein, and that he is possessed of another equal undivided moiety as a tenant by curtesy. These recitals did not fit, apparently, his interest in beach lots 4 and 5, for in them he was possessed of a tenancy by curtesy in the whole and was not seised of any equal moiety or other estate in fee. The recitals, however, would accurately fit the situation by declining to consider the description as applying by implication to beach lots 4 and 5 of the Cornwell partition. There is no express application in the trust deed to such beach lots, and there can be no implied application unless ownership of said beach lots had been in some way divested from Rachel Banister and vested in her sister Alice Martin and then treated by Alice Martin as a part of the Rock Hall farm. There is no direct proof of such a transfer. That much is undisputable. The appellant contends, however, that the surrounding circumstances and subsequent actions of the parties to the trust deed were such as to raise a presumption of a grant from Rachel Banister to Alice Martin of the beach lots which had been allotted to Rachel Banister. Alice Martin died in 1815, and Rachel Banister died in 1817. The appellant introduced a large amount of such proof in an endeavor to support the presumption of a lost grant from Rachel Banister to Alice Martin. No proof was produced to show any open use or possession of these beach lots by Alice Martin. Because of the lapse of time, the impossibility of producing testimony of living witnesses, and the absence of relevant documents, the failure to give such proof may be understood, whatever were the actual facts. So far as the appellant's proofs went on this point, they were undisputed, and all the established facts were found by the referee, who refused, however, to find as facts the inferences of further facts which the appellant claims should have been drawn from the established facts set forth in its proofs.

Briefly stated, these proofs go to show that the trustees Bogardus and Foster subsequently acted as if their trust deed covered also the beach lots which had been allotted to Rachel Banister in 1809, and made conveyances of parts thereof to various grantees, and that some of such grantees had in turn conveyed, and that as to some of such lands there is now and has been for a great period of time open and undisputed possession under a claim of title springing from the conveyances of said trustees. It is further shown that the trustee Bogardus was a reputable lawyer of New York City, that the trust deed was in his own handwriting, that he was the executor of Alice Martin, and had made a conveyance to Thomas Banister as such executor of an undivided moiety of the Rock Hall farm or estate. From all of these facts, it is argued that it must be presumed that Bogardus and his cotrustee must have known of the existence of a grant from Rachel Banister to Alice Martin covering Rachel's allotment of 1809, or otherwise their subsequent acts in making conveyances of such beach lots under the trust deed is unintelligible. If the trust deed did not cover these beach lots of Rachel, then such acts of the trustees are clearly unintelligible unless the trustees acted ignorantly and negligently. Can the presumption of a lost grant be indulged in in order to hold that the trustees acted knowingly and within their trust powers?

[4] The doctrine of our law in relation to the presumption of a lost grant came to us from England. It has been applied frequently in this country in various reported cases. To give it application, it is not necessary to prove circumstances which indicate the probability that a grant was actually made; it may be applied where the circumstances indicate only a possibility of an actual grant. Fletcher v. Fuller, 120 U. S. 534, 7 Sup. Ct. 667, 30 L. Ed. 759, and cases cited.

[5] Before it can be applied, however, there must be shown open actual possession in the presumed grantee of such a nature as to be indicative of exclusive ownership and likewise continuous over a long number of years. The doctrine arose in England at a time when there were no recording acts and no statute of limitations as to adverse possession of real property. The public necessity of protecting titles arising out of open, actual, and adverse possession of real property over a long term of years gave rise to the fiction of a presumption of a lost grant, as the English law had not then adopted, if ever since, the rule of Roman law as to title by prescription, and there was, when this legal doctrine came into active play, no other method under the English law by which title to real property might be acquired except in a manner resting ultimately upon some form of a grant.

Open possession was the essential element on which the doctrine rested, and this possession was required, at first, to be from "time immemorial." At the end of the eighteenth century, the English courts had formulated a rule that open possession for 20 years was sufficient to presume the existence of a "modern lost grant." Markby's Elements of Law (6th Ed.) pp. 272–278, incl.

In this state it has been quite recently declared that the time of possession necessary to support the presumption of a grant must not be less than the period fixed by statute for the adverse possession

which ripens into title; that is, 20 years. Mission of the Immaculate Virgin v. Cronin, 143 N. Y. 524, 527, 38 N. E. 964. There are many earlier cases in this state on the rule of the presumption of a lost grant; but, in all of them, the presumption was indulged in only in relation to an adverse possession of 20 years or more.

There was therefore little, if any, room for a finding by the referee that Alice Martin had become vested with the title to beach lots 4 and 5 by grant from Rachel Banister, unless it be that such presumption of grant can be indulged in to reconcile the acts of Bogardus and Foster under their trust deed. A legal presumption of a lost grant has never been based upon such circumstances, at least there is no authority cited or to be found which asserts such a rule. The appellant's counsel, with close reasoning and great dialectical skill, discusses a great number of attendant circumstances in support of his contention which, while we do not particularize them here, we have examined in detail, and, we trust, with due care. Unless Alice Martin had acquired title to the beach and other lots which had been allotted in 1809 to Rachel Banister, it seems reasonably clear on the record before us that the trustees Bogardus and Foster had no title thereto. Assuming, however, for the time being, that the trustees, when they conveyed to Lockwood, the elder, certain beach lots described as 6 and 7, did intend to convey beach lots 4 and 5, the situation is not improved for the appellant. For the deed by itself gave no title, and there is nothing to show that its grantee ever entered upon these premises and exercised acts of possession, claiming under the deed. The deed to him from the trustees is dated March 12, 1832, and he died intestate in 1838, leaving a widow and a son, Benjamin C. Lockwood, Jr. The referee has found that as early as 1854 there was a grove of cedars on this land; and that the younger Lockwood, in that year, had sold cedars from the premises to one Andrew Brady for use as fence posts on land elsewhere situated; and that, prior to 1864, the premises were known to people residing in the neighborhood as "Lockwood's Cedars," or "Benjamin Lockwood's Cedars"; and that from 1850 to 1869 the lands were useful and valuable because of the presence of the cedars and their adaptability for use as fence posts. It was likewise proved that Donohue, after 1869, frequently cut therefrom cedars for use as fence posts on his property elsewhere situated. The land, however, was never inclosed by fences, though its boundary lines were staked and monumented. It was practically a barren stretch of sandy seashore, and it did not appear upon the assessment lists of the town until 1881. It nature did not adapt it to cultivation, and there was none.

[6] This situation is the same, however, as was presented by the record on appeal in Mission of the Immaculate Virgin v. Cronin, ut supra, where it was held by the Court of Appeals that these facts were not sufficient to show such possession as would constitute an adverse possession, nor to form a basis upon which could rest a presumption of a lost grant to the Lockwoods from the Banisters. So far as the facts established are practically the same, we think this court is bound by the decision in Mission of the Immaculate Virgin v. Cronin, supra.

[7] If the appellant, or its grantor, Donohue, or his grantors, the Lockwoods, had been in actual adverse possession continuously for 20 years before the bringing of this present action, there could be no question as to its title; but the adverse possession of the appellant, though begun more than 20 years before this bringing of this action, was not continuous, as it was interrupted by the hostile possession of one Cronin, who went into possession in 1887 and against whom it had brought unsuccessfully an action in ejectment. Thereafter, in 1901, Cronin went out of possession, and the appellant again went in; but the time of possession antecedent to Cronin's hostile possession cannot be tacked to the time when the present possession began in order to fill out the time required by statute for adverse possession to ripen into title. Bliss v. Johnson, 94 N. Y. 235; 1 Cyc. 1000.

This case abounds in troublesome and complicated questions, as is apparent from the continuous litigation which has arisen concerning these lands. The argument presented to this court on this appeal has been so detailed and so elaborate as to require patient examination and thoughtful care as to the numerous points advanced. In this opinion we have discussed but the main features of the case; but we have not overlooked any of the cumulative or incidental arguments advanced. We think we should not be justified in rejecting the findings of the referee as against the weight of evidence to reverse the interlocutory judgment entered thereon.

The interlocutory judgment is affirmed, with costs.