## YONKERS *v.* DOWNEY, RECEIVER.*

No. 542. Argued February 29, 1940.—Decided April 22, 1940

*Messrs. Leonard G. McAneny* and *E. J. Dimock,* with whom *Mr. J. Donald Rawlings* was on the brief, for petitioners.

---

\* Together with No. 543, *Condon, Mayor, et al.* v. *Downey, Receiver;* No. 544, *Condon, Mayor, et al.* v. *Downey, Receiver;* and No. 545, *Yonkers, Trustee,* v. *Downey, Receiver,* also on writs of certiorari, 308 U. S. 547, to the Circuit Court of Appeals for the Second Circuit.

592

*Mr. George P. Barse,* with whom *Messrs. Benjamin W. Moore, Milton L. Romm, John F. Anderson,* and *Lee Roy Stover* were on the brief, for respondent.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

By these companion suits, begun during 1936, the Receiver of The First National Bank and Trust Company of Yonkers ("The Bank"), seeks to recover fifty per centum of deposits withdrawn by petitioners from the association while insolvent. Thus, it is said, they obtained unlawful preferences within the meaning of the National Banking Act.[1] From corporate assets, general creditors have been paid dividends amounting to fifty per centum of their claims—forty, December, 1933; ten, November, 1937.

---

[1] Title 12 U. S. C.—

Sec. 91. "All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court." (R. S. § 5242.)

Sec. 194. "From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held." (R. S. § 5236.) ,

The Bank was located in New York. In each cause the points of law and fact are substantially alike. It will suffice to consider them as presented by the Record in No. 542.

Petitioner's deposits with The Bank, March 4, 1933, amounted to $277,000. To secure this and other smaller public ones, bonds of the association totalling $535,000 were in pledge.

The Governor of New York proclaimed Saturday, March 4th and Monday, March 6th, 1933, bank holidays. Later the President and the Governor extended such holidays through March 9th. The Bank was not opened for unrestricted business after March 3rd. A Conservator, appointed March 20th, remained in control until January 23, 1934, when a Receiver took charge.

Between March 9th and 20th, 1933, petitioner withdrew deposits amounting to $89,000; between March 20th and 28th, $67,000. On the latter day, under direction of the Conservator, petitioner's remaining deposits were paid and The Bank retook the pledged bonds.

A jury having been waived the cause was tried to the court upon pleadings and evidence. Among other things it found—

> The pledge of assets by The Bank to secure the deposits was *ultra vires* and unlawful.
>
> The Bank was insolvent March 6th, 1933, and as of that day the rights of creditors became fixed.
>
> The payments of deposits to petitioner were not allowed by any Presidential Proclamation or Executive Order. They were made voluntarily under mistake of law by an officer of the United States and are recoverable. Also they were made with intent to give petitioner preference over other creditors.
>
> No statute of New York confers upon state banks general power to pledge assets to secure deposits. They have no such power under the common law of New York.

Judgment went for the Receiver for fifty per centum of the amounts withdrawn by the petitioner after March 9, 1933, with interest, etc.

The Circuit Court of Appeals affirmed this action. 106 F. 2d 69. It held all withdrawals after March 9th occurred when the facts indicated The Bank would be unable to pay depositors in due course and that adequate evidence supported the trial court's findings of an intent to prefer. We find no reason to disregard these findings by two courts and accept them as correct.

The Circuit Court of Appeals further held national banks have no implied power to pledge assets to secure deposits; that here The Bank was not empowered so to do by the Act June 25, 1930 [2]; that the pledge might

---

[2] Act June 25, 1930, c. 604, 46 Stat. 809; 12 U. S. C., § 90—

"All national banking associations, designated for that purpose by the Secretary of the Treasury, shall be depositaries of public money, under such regulations as may be prescribed by the Secretary; and they may also be employed as financial agents of the Government; and they shall perform all such reasonable duties, as depositaries of public money and financial agents of the Government, as may be required of them. The Secretary of the Treasury shall require the associations thus designated to give satisfactory security, by the deposit of United States bonds and otherwise, for the safekeeping and prompt payment of the public money deposited with them, and for the faithful performance of their duties as financial agents of the Government: *Provided,* That the Secretary shall, on or before the 1st of January of each year, make a public statement of the securities required during that year for such deposits. And every association so designated as receiver or depositary of the public money shall take and receive at par all of the national currency bills, by whatever association issued, which have been paid into the Government for internal revenue, or for loans or stocks: *Provided,* That the Secretary of the Treasury shall distribute the deposits herein provided for, as far as practicable, equitably between the different States and sections.

"Any association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the

be rescinded without return by the Receiver of the sums withdrawn. With these conclusions we agree.

Unless empowered by the Act June 25, 1930 or concerning federal funds (not here claimed) as in *Inland Waterways Corp.* v. *Young, ante,* p. 517, national banks may not secure deposits by pledge of assets.

*Texas & Pacific Ry. Co.* v. *Pottorff,* 291 U. S. 245, 253–255, and *Marion* v. *Sneeden,* 291 U. S. 262, authoritatively interpreted the National Banking Act and approved the view that under this, a national bank possesses no inherent power to secure deposits, public or private, by pledging assets, and that such a pledge is both *ultra vires* and contrary to public policy. "The measure of their powers is the statutory grant; and powers not conferred by Congress are denied." Also, that in case of insolvency, assets so pledged, may be reclaimed without payment of the deposits. "To permit the pledge would be inconsistent with many provisions of the National Bank Act which are designed to ensure, in case of disaster, uniformity in the treatment of depositors and a ratable distribution of assets." The result in these causes was not influenced by consideration of local law.

We cannot accept the suggestion of counsel for petitioner that the cited opinions merely declare a pledge of assets *ultra vires* and leave the consequences to be determined by the law of the state where it occurs. This view is not in harmony with the language of the opinions nor with the general purposes of the National Banking Act there pointed out.

Under the common law as interpreted in New York, pledge of securities by a state bank to secure deposits is "contrary to law and beyond the power and authority

safekeeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State."

vested in the officers." Although forbidden, such a pledge will not be set aside unless deposits made in reliance upon it are first repaid. *State Bank of Commerce* v. *Stone*, 261 N. Y. 175, 187–188; 184 N. E. 750; *City of Mount Vernon* v. *Mount Vernon Trust Co.*, 270 N. Y. 400, 406; 1 N. E. 2d 825.

The Act of June 25, 1930 permits national banks to give security for public deposits "of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State." Counsel maintain that within the fair intendment of this, state banks in New York are "authorized" to pledge bonds to secure public deposits. They rely upon the rulings of the local courts, in the causes last cited, concerning conditions which must be met before an *ultra vires* act will be set aside.

They submit that corporations have capacity to accept the result of their actions. "That the capacity to accept the consequences of an *ultra vires* act is itself a power." Further, that " 'giving' a power is but another word for 'authorizing' its exercise." Hence, the argument seems to run, as a state bank may hold the fruit of a pledge until return of the thing pledged, therefore, it is "authorized by law" to make a pledge thus conditioned.

In this procession, obviously, different meanings are attributed to the word "power" and it is confused with "capacity" and "authority." In one sense, every corporation has "power" to do wrong, also "capacity" to suffer the consequences of wrong-doing. But no corporation has authority to violate an inhibition or go beyond the limits of its charter. Authorization to do a forbidden thing cannot be inferred from capacity to accept the prescribed consequences. The law forbade local institutions to make pledges such as the one here in question.

The challenged judgments must be

*Affirmed*