FREDERICK BROWN, Plaintiff, *v.* LOUIS N. ROSENBAUM, Defendant.

Supreme Court, Trial Term, New York County, November 14, 1940.

*Spence, Hopkins, Walser & Hotchkiss* [*Kenneth E. Walser, James H. Halpin* and *Thomas Epstein* of counsel], for the plaintiff.

*Breed, Abbott & Morgan* [*Charles H. Tuttle* and *Thornton C. Land* of counsel], for the defendant.

EDER, J. Action at law. Jury waived. It was stipulated by counsel for the respective parties that the provisions of sections 439 and 440 of the Civil Practice Act be waived and that the court may render such decision and judgment as may be warranted by the evidence. This is an action against the actual but unregistered owner of national bank stock to recover the amount of an assessment paid by the nominal owner and stockholder of record after levy of such assessment against him by the Comptroller of the Currency of the United States pursuant to the authority conferred by section 64 of title 12 of the United States Code, which reads as follows:

" Individual liability of shareholders; transfer of shares. The stockholders of every national banking association shall be held

individually responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock. The stockholders in any national banking association who shall have transferred their shares or registered the transfer thereof within sixty days next before the date of the failure of such association to meet its obligations, or with knowledge of such impending failure, shall be liable to the same extent as if they had made no such transfer, to the extent that the subsequent transferee fails to meet such liability; but this provision shall not be construed to affect in any way any recourse which such shareholders might otherwise have against those in whose names such shares are registered at the time of such failure."

On March 3, 1933, the Governor of the State of New York issued a proclamation suspending all banking transactions in the State on March fourth. On March sixth, at one A. M., the President of the United States issued a similar proclamation which continued in effect throughout the nation until March ninth. These proclamations comprised the suspensory banking period commonly known as the " bank holiday." The national banking association known as " The Harriman National Bank & Trust Company of the City of New York," pursuant to the Governor's proclamation, suspended all its banking transactions; it continued such suspension, also, in pursuance of the President's proclamation. Whether the Governor's proclamation had any binding effect on National banks doing business within the State is an element not considered necessary to the disposition of this case. The bank was concededly insolvent when it suspended business after three P. M., on March third, and it never again reopened as a normal banking institution doing a regular unrestricted banking business.

During the suspensory period it was permitted — as were other National banks — under Treasury Regulations, to conduct a limited and restricted banking business, that is, to receive deposits under a trust arrangement, the deposits being segregated and specifically marked and against which the bank was authorized to honor checks for payroll and other emergency purposes, and it was also authorized to receive payment of its loans. After the suspension period had terminated it was not permitted to reopen, as were some other National banks, and on March thirteenth the Comptroller appointed a conservator of the bank, who took possession, and ultimately, on October 16, 1933, appointed a receiver of the bank.

During the period of sixty days anterior to the failure of the bank to meet its obligations, one George Blumenthal (plaintiff's assignor) was a stockholder of record of a number of shares of the stock of the

bank. In February, 1933, he sold some of these shares in the open market, and after certain mesne transfers, they were acquired, among others, by one Masel and by one Mitchell, who thereafter, during that month, caused eighty-six of these shares of stock to be transferred on the books of the bank and registered in their names as the owners of record; three shares were also so transferred and registered on March first and three shares on March ninth.

On the morning of March sixth, after ten o'clock, the defendant requested, or rather instructed, one Eugene Neville, an assistant cashier of the bank (but whose duties were limited merely to soliciting new customers), to buy for him ninety-two shares of its stock, which Neville did, placing the order with a brokerage concern; the purchase price was $2,216 and the defendant caused to be delivered to Neville this sum of money, in cash, to pay for and obtain delivery of the stock to him as defendant's agent. While defendant claims to have purchased the stock directly from Neville as an officer of and representing the bank, I find, on this disputed issue of fact, that this is not so and that Neville acted solely as the defendant's agent in the transaction. This brokerage concern, acting for the defendant, purchased the shares of stock of Masel and Mitchell after their sale by Blumenthal and acquisition by divers transferees and these shares, I find, were specifically allocated to the defendant; ninety-one shares were delivered to Neville as the defendant's agent, except some five shares which were delivered on April eleventh, after the appointment of the conservator, and, therefore, these five shares have been eliminated, plaintiff limiting the claim to eighty-six shares. Between March sixth and March thirteenth, on which latter date the conservator took possession of the bank, these shares of stock were not transferred of record to the defendant; in fact, he never became a stockholder of record; the shares stood and remained on the books of the bank in the names of Masel and Mitchell as the owners of record thereof.

The Comptroller of the Currency, under the authority of the statute *supra*, on November 13, 1934, levied the assessment against Blumenthal as a stockholder who had made a transfer of his shares within sixty days next preceding the date of the failure of the bank to meet its obligations. Blumenthal thereupon notified the defendant, as the actual though unregistered owner of the stock, of the assessment thus levied against him by the Comptroller of the Currency and called upon him to pay it; defendant refused to do so and Blumenthal thereupon paid it, as he was legally bound to do, being expressly made liable by the statute. This action is now brought to recover from the defendant the amount of the assessment paid as aforementioned, on the theory that the defendant being

the actual owner of the stock and entitled to all its benefits and emoluments, was primarily liable for the assessment levied, and that in the circumstances, there arises, in law, an implied promise and obligation on his part to repay and reimburse Blumenthal for the payment thus made by him. In its ultimate aspect the theory is reduced to the proposition that the law will not, in such a situation, permit the defendant to thus unjustly enrich himself. *Laurent* v. *Anderson* (70 F. [2d] 819, 823) is strongly relied on by plaintiff as indicating his right to recover, wherefrom the following excerpt is given; " It has long been settled that the real and beneficial holder of bank stock is primarily liable for the double liability." The case is clearly distinguishable for what the court was there speaking of was the primary liability as between the owner of record and the *immediate* beneficial owner *under him*. And upon analysis it will be found that the various cases cited by plaintiff are authority only for the proposition that the real or beneficial owner of stock is liable to indemnify *his* record holder. It is to be observed that the statute itself does not give a stockholder who is liable for an assessment the right to recover over against any of his subsequent transferees. (See *Goess* v. *Fuld*, referred to in N. Y. L. J. Dec. 24, 1935, p. 2597. See, also, *Broderick* v. *Aaron* [*Rice*], 264 N. Y. 368, 374, 377.)

The defendant contends that assuming he purchased the stock within the sixty-day period mentioned in the statute he still cannot be held liable over to Blumenthal inasmuch as such liability over can only result from the existence of a quasi trust relationship between the stockholder of record and the actual or beneficial owner of the stock, arising from privity of contract between the parties, or from privity of estate, and that as no such relationship ever existed here between himself and Blumenthal, there can be no recovery. I feel constrained to view this contention as correct.

The quasi trust relationship between seller and purchaser begins when the stockholder of record sells the stock and it continues until the purchaser, or his assignee, becomes the stockholder of record, when it ends; from that time on the seller owes no further duty or obligation to the buyer. (*Broderick* v. *Aaron* [*Rice*], *supra*.) Thus, with the trust relationship between Blumenthal and Masel and Mitchell terminated by the transfer of the stock to them on the books of the bank, they becoming the stockholders of record, Blumenthal could not even recover from them, either as immediate or subsequent transferees. (*Broderick* v. *Aaron* [*Rice*], *supra*.) As between Masel and Mitchell, as stockholders of record, and this defendant, as the unregistered purchaser of their stock, there existed this quasi trust relationship and it would continue until he, in turn

became the stockholder of record. (*Broderick* v. *Aaron* [*Rice*], *supra*. See, also, *Broderick* v. *Adamson* [*Grief*], 270 N. Y. 260.)

If, after Blumenthal sold this stock, which Masel and Mitchell later acquired by purchase from others, they did not become the holders of record, but as the unregistered owners of the stock they transferred these shares to the defendant, Blumenthal would, none the less, become the trustee of the defendant as the actual and beneficial owner of the stock, not by virtue of any privity of contract between them, for there was none, but by reason of privity of estate resulting from the defendant's status as assignee and transferee of the shares (*Broderick* v. *Aaron* [*Rice*], *supra*, p. 378; *Broderick* v. *Adamson* [*Grief*], *supra*), and if the stock had been purchased by the defendant within the sixty-day period, though not directly from Blumenthal, the assessment levied against him (Blumenthal) as a stockholder who made such transfer within such period, and which he was compelled to pay, would be recoverable by him from the defendant; this would be so only because of the existence of such trust relationship. (*Broderick* v. *Aaron* [*Rice*], *supra*.) The trust relationship existing between Blumenthal and Masel and Mitchell was completely extinguished when Masel and Mitchell had these shares of stock transferred to themselves on the books of the bank as the holders and owners thereof; with the sale of the stock by them to the defendant, a trust relationship was created and existed as between them as the registered holders of the stock and the defendant as the actual though unrecorded owner thereof; but, as between Blumenthal and this defendant, no such relationship of trust existed, and, as a consequence, no correlative rights, duties or obligations of any kind were created or existed — this being the basis of liability over — and in the absence of the existence of such a relationship between them the defendant was not liable over to Blumenthal for the assessment levied against him by the Comptroller by virtue of this statute and which Blumenthal was compelled to pay and there can be no recovery against the defendant therefor. (*Broderick* v. *Aaron* [*Rice*], *supra*.)

But assuming, arguendo, that defendant's contention, just discussed, be wrong, and that no trust relationship is necessary to create liability over to Blumenthal, yet there is another reason which, to me, seems to bar a recovery by the plaintiff.

Under the terms of the statute the assessment may be levied against one who was a stockholder, or who has made a sale or transfer of his stock, or who became a stockholder *within sixty days next prior* to the *date* of the *failure of the bank to meet its obligations* (*Church* v. *Hubbard*, 91 F. [2d] 406); thus, both time and failure of the bank to meet its obligations are made the essence and criterion

in fixation of liability to assessment; hence, if such ownership of record and transfer thereof, in good faith, reaches beyond the sixty-day period liability does not attach (*Vann* v. *Almours Securities, Inc.*, 96 F. [2d] 214); and it is also held that one who becomes a stockholder *after* the *time of the failure of the bank to meet its obligations* is clearly not amenable to the provisions of this statute; it operates retrospectively and not prospectively (*Ward* v. *Simon*, 23 F. Supp. 117. See *Broderick* v. *Aaron* [*Kornberg*], 268 N. Y. 260); language could hardly be more comprehensive.

In this connection the defendant stresses strongly Exhibit I, which is Circular Letter CR-7, June 9, 1933, of the Comptroller of the Currency. It relates to and concerns, as its title denotes, the determination of the official date of closing of banks in conservatorship or receivership under banking holiday proclamations or acts. *Inter alia,* the said circular letter provides:

" 1. Where prior to the Presidential proclamation, a banking holiday Proclamation or Act was issued by the State in which the subject bank is located, and the bank immediately thereafter closed in pursuance of such State Proclamation or Act, such date of closing should be taken as the official date of closing, assuming such bank thereafter remained closed."

The defendant contends that this circular letter constitutes a determination of the official date of closing, *i. e.,* the official date of the failure of the bank to meet its obligations within the meaning of section 64 of title 12 of the United States Code, imposing stockholders' liability for assessment, and cites in support thereof *Bryce* v. *National City Bank* (17 F. Supp. 792) which discusses this circular letter. Plaintiff, on the other hand, asserts that this circular letter and the rules laid down therein govern only the rights of depositors and creditors and do not involve or determine or fix the official date of closing for determining the liability of stockholders for assessment.

Strictly speaking, this is so, though I do not feel that it matters in the ultimate determination or fixation of that date. The *Bryce* case (*supra*) referred to this circular letter as laying down certain rules governing the determination of the date of the official closing of a National bank with respect to the time at which the rights of creditors thereof were to become fixed for the purposes of their liquidation (pp. 797, 798); it did not refer to this circular letter as holding or ruling that this letter was a judicial determination by the Comptroller that the bank failed on that date for *all* purposes, including stockholders' assessments. That precise contention was made in *Pyne* v. *Jackman* (12 F. Supp. 653), and was overruled. There the court said (p. 656): " I do not think that this could or

was intended to be a judicial determination of or to effect the legal status of a stockholder under section 64, but was intended as merely the date as of which the rights of the depositors of such a bank were to be adjusted."

This is also plainly evidenced by the last paragraph of the circular letter which states the purpose of the rule:

" 8. The official date of closing of a bank having been fixed in accordance with the foregoing instructions, it follows that as a general rule (subject to exceptions indicated in specific instructions from time to time issued), the rights of all depositors and creditors of a bank are fixed or ' frozen ' as of the official date of closing of such bank. Consequently, the calculation and allowance of, — the claims of general depositors or creditors, of setoffs, and of interest upon interest-bearing deposits or obligations payable by the bank and constituting general claims only, are to be made as of, or retroactive to, the official date of closing of such bank."

In support of his claim defendant cites *Yonkers* v. *Downey* (309 U. S. 590); *Oppenheimer* v. *Harriman National Bank & Trust Co.* (301 id. 206); *Bryce* v. *National City Bank* (*supra*); *Goess* v. *Heckscher* (Dist. Ct. S. D. N. Y., KNOX, J., Dec. 1, 1934, unreported); *Gimble* v. *Harriman National Bank & Trust Co.* (83 F. [2d] 153; certiorari denied, 299 U. S. 559); *Goess* v. *Ehret* (85 F. [2d] 109, affg. 13 F. Supp. 630); *Matter of Battani* (6 id. 376); *Dehne* v. *Mine Safety Appliance Co.* (94 F. [2d] 956); *Hardee* v. *Washington Loan & Trust Co.* (91 id. 314); *Hudson Co.* v. *Thomas* (6 F. Supp. 857); *Steele* v. *Randall* (19 F. [2d] 40). All of these cases relied on by defendant, it will be observed, involved the closing date in respect of the time at which the rights of creditors of the bank became fixed for the purposes of liquidation; none of them involved the determination of the date of the failure of the bank to meet its obligations within the meaning of section 64 of title 12 of the United States Code imposing stockholders' liability. Circular Letter CR-7, *supra*, appears not to have been mentioned in the *Downey* case (*supra*), either in the record, the briefs or the opinion.

Therefore, the fixation of this date must be here determined.

Under applicable presumptions and permissible inferences, however, this presents no problem.

It is to be noted that liability is not predicated on the mere insolvency of the bank, but, basically, upon its " failure  *  *  * to meet its obligations." A corporation may be insolvent but it does not conclusively or necessarily follow from this that it will fail to meet its obligations; instances are known where officers and directors of an insolvent corporation, and even stockholders, for various reasons, have come to its aid with voluntary contributions

to enable it to meet its obligations, and thus we have an instance of a corporation being insolvent and yet meeting its obligations. It has been said that the Congress, in the National Banking Act, has clearly indicated in sections 91, 161, 191 and 481 of title 12 of the United States Code, that it recognized the distinction between the insolvency of a bank and the failure to meet its obligations, " and that they are quite different things." (*Pyne* v. *Jackman, supra*, p. 656.) The court further said that " it is generally surmised that many banks which have not failed to meet their obligations were temporarily insolvent." A specific instance of a solvent corporation being unable to meet its obligations due to non-liquid or frozen assets is *Wyman* v. *Wallace* (*American National Bank*) (201 U. S. 230, 243). (See, also, 3 Honnold's Supreme Court Law [1933 ed.], § 6, p. 1727, " National Banks.") As a general rule, though, from the fact of insolvency there flows a justifiable presumption and deduction that one who is insolvent is generally unable to meet his obligations; this presumption is, of course, subject to rebuttal, but in the absence of proof to the contrary by the insolvent debtor, the mentioned presumption is a justified one; and if this presumption, as applied to the instant case, be followed by failure of the bank to ever again reopen as a regularly functioning banking institution, the presumption of failure to meet its obligations from the fact of insolvency becomes a conclusive one and necessarily relates back in point of time, as respects the failure of the bank to meet its obligations, to the date of insolvency, which is the date when it ceased to normally function as a regular banking institution. (*Downey* v. *Yonkers*, 106 F. [2d] 69; affd., *sub nom. Yonkers* v. *Downey*, 309 U. S. 590; 23 F. Supp. 1018, 1022; *Oppenheimer* v. *Harriman National Bank & Trust Co.*, 301 U. S. 206, 207, 214. See Lawson on Law of Presumptive Evidence [2d ed.], chap. XXI, pp. 639, 641, citing *Justice* v. *Lang*, 52 N. Y. 323.)

Since the bank failed to function as a normal banking institution after the close of business on March 3, 1933, I perceive of no logical reason why, under the circumstances here disclosed, the date of the failure of the bank to meet its obligations should not be fixed at March 4, 1933, for its insolvency on March third being conceded, it never having functioned after the close of business on that day as a normal and unrestricted banking institution, and no attempt having been made by plaintiff to show any change in the bank's financial condition after that day, and no attempt having been made by plaintiff to show that the bank thereafter met any of its obligations — upon this state of facts the presumption and inference are authorized and permissible that the bank was without sufficient means to meet its obligations in due course after the close of business

on March third (*Downey* v. *Yonkers, supra; Oppenheimer* v. *Harriman National Bank & Trust Co., supra;* Lawson on Presumptive Evidence, *supra*), and as respects this action, March 4, 1933, is to be regarded as the date of the failure of the bank to meet its obligations, and as the fixation date for the purpose of liability of stockholders to assessment under section 64 of title 12 of the United States Code. On that day the bank was both insolvent and unable to meet its obligations. The shares of stock were purchased and acquired by the defendant *after* that day and hence he cannot be held liable over to Blumenthal for reimbursement; and this is so whether he was the owner and holder of record or the actual though unrecorded owner of the shares (*Ward* v. *Simon, supra; Broderick* v. *Aaron* [*Kornberg*], *supra*); in that situation no assessment could be validly levied against him (*Ward* and *Broderick* cases, *supra*).

I now come to the final claim of the plaintiff.

The plaintiff states that the contentions now made on this trial by the defendant were similarly made on the prior trial of this case and overruled, namely, (1) that the duty of the actual owner to indemnify runs only to the contemporaneous record holder; (2) that the Harriman Bank failed to meet its obligations at the opening of the bank holiday on March 4, 1933, two days before the purchase by defendant of the stock; that upon appeal these claims, among others, were elaborately briefed, *pro* and *con*, in the Appellate Division and from the fact that the Appellate Division reversed the judgment of the trial court upon another ground (259 App. Div. 304), it is earnestly contended that the determination of the learned trial judge on the former trial that the defendant's claims there made were invalid, and that the defendant was liable, should, in this trial, be followed upon the assumption that as they were not mentioned in the opinion of the Appellate Division it must be inferred that they were regarded by the appellate court as untenable and that the ruling of the learned trial judge in the respects referred to was thereby approved and must be deemed correct, and that, in consequence, plaintiff must recover.

I am unable to concur in these views because they are founded upon an erroneous premise.

The doctrine or rule of *stare decisis* is merely a rule of precedent; stated in its general and simplest terms, the doctrine of *stare decisis* expresses the policy of the courts to stand by precedents and not disturb *settled* points; it is not a rule of compulsion but one of deference to precedent (*Matter of Herle*, 165 Misc. 46; *United States* v. *Certain Bottles*, 37 F. [2d] 137; *Neff* v. *George*, 364 Ill. 306); moreover, the *stare decisis* rule is not universally applicable to all situations without exception, and has more or less force, according to the

nature of the question *decided* (*Kellum* v. *Corr*, 149 App. Div. 200, 204; affd., 209 N. Y. 486; 21 C. J. S. § 189, p. 307); again, this rule or doctrine is but an application of the doctrine of estoppel to court decisions (21 C. J. S. § 187, p. 303). Unlike *res judicata*, which relates to the conclusiveness of prior judicial findings or adjudications, *stare decisis* relates to the binding effect of the legal principles decided. (*Bridenbaker* v. *Kissell*, 131 Misc. 534; affd., 226 App. Div. 850; 21 C. J. S. § 188, pp. 304, 305). *Stare decisis* is not an inflexible doctrine (Moschzisker on Stare Decisis [1929 ed.], p. 3) and " the degree of control to be allowed a prior judicial determination depends largely on the nature of the question at issue, the circumstances attending its decision." (Id. p. 8.) In *Kellum* v. *Corr* (*supra*) the court said (p. 204): " The reversal of a judgment on one specific point does not mean that the appellate court has considered all other points of attack untenable."

I am mindful that adherence to precedent should be the rule and not the exception, particularly by *nisi prius* tribunals (*Matter of Gilchrist*, 130 Misc. 456), yet, predicated upon the views and pronouncements *supra*, I am of opinion that a party to a litigation should not be cut off under this rule until his claims and rights are fully adjudicated. (*Reflectolyte Co.* v. *Luminous Unit Co.*, 20 F. [2d] 607.) They were not so adjudicated here by the Appellate Division decision. (*Kellum* v. *Corr, supra:* Black's Law of Judicial Precedents [1912 ed.], p. 186.)

If it were at all legally possible to do so I should have no hesitancy in awarding plaintiff judgment, for it seems to me that it is only fair and just, and compatible with good conscience, that the actual or beneficial owner of the stock should be the one obliged to pay the assessment; every concept of justice would seem to require that the penalty be visited on the actual and beneficial owner of the stock, rather than on a theoretic or synthetic one; but as I interpret the decisions, I have no alternative and must render judgment for the defendant. Judgment is accordingly rendered for the defendant dismissing the complaint on the merits.