### FEDERAL DEPOSIT INS. CORPORATION v. TREMAINE et al.

District Court, S. D. New York.
Dec. 3, 1940.

---

[75] See case in G. O. 10, Dept. of W. Va., 1862.

178

Edwin A. Tennant, Jr., of New York City (Edwin A. Tennant, Jr., Harry Rodwin, and Irving H. Jurow, all of New York City, of counsel), for plaintiff.

John J. Bennett, Jr., Atty. Gen., State of New York (James S. Regan, Asst. Atty. Gen., in Charge, and Robert P. Beyer, and Hyman Wank, Asst. Attys. Gen., of counsel), for defendant Morris S. Tremaine.

Berle & Berle, of New York City (Winthrop H. Kellogg, of New York City, of counsel), for defendants Adolf Berle, Jr., and Louis M. Faulkner.

William C. Chanler, Corp. Counsel, of New York City (Seymour B. Quel, Bernard Newman, and Arthur H. Kahn, all of New York City, of counsel), for defendant Almerindo Portfolio.

John V. Sheridan, of New York City, pro se.

KNOX, District Judge.

This suit, based upon the laws of the United States, 12 U.S.C.A. § 264(j) paragraph 4th, grows out of the liquidation of the assets of the Fort Greene National Bank of Brooklyn, New York (hereinafter referred to as the Bank), and of which, upon

the Bank's failure, the plaintiff, Federal Deposit Insurance Corporation (hereinafter referred to as F. D. I. C.), became receiver. Jurisdiction is predicated, also, upon the fact that the United States is the owner of more than one-half of the capital stock of the F. D. I. C. 28 U.S.C.A. § 42.

The defendant Tremaine was, and still is, Comptroller of the State of New York. The remaining defendants, during the respective times noted below, occupied the office of City Chamberlain of the City of New York:

John V. Sheridan (sued herein as John B. from October 20, 1933 to January 1, 1934; Adolf A. Berle, Jr. (sued herein as Adolph A. from January 4, 1934, to November 15, 1936; Louis M. Faulkner, from November 16, 1936 to January 15, 1937; Adolf A. Berle, Jr., from January 16, 1937 to December 15, 1937; and Almerindo Portfolio, from December 16, 1937 to date.

Effective January 1, 1938, the office of City Chamberlain was abolished and is now known as that of "City Treasurer." As used herein and except as otherwise noted, "Chamberlain" and "Treasurer" mean the occupant of the same office.

In 1930, the Bank, then doing business in Brooklyn, was desirous of increasing its deposits, and pursuant to the provisions of 12 U.S.C.A. § 248(k), applied to the Board of Governors of the Federal Reserve Board (now the Federal Reserve System) for a permit to act in any fiduciary capacity in which banks of the State of New York are permitted to engage. This Act authorized the Board of Governors of the Federal Reserve System "To grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located. * * *

"Whenever the laws of a State require corporations acting in a fiduciary capacity, to deposit securities with the State authorities for the protection of private or court trusts, national banks so acting shall be required to make similar deposits, and securities so deposited shall be held for the protection of private or court trusts, *as provided by the* State law." (Italics are mine.)

In 1930, the National Legislature, enacted a law, 12 U.S.C.A. § 90, which reads:

"All national banking associations, designated for that purpose * * * shall be depositaries of public money, under such regulations as may be prescribed. * * *

"Any association may, upon the deposit with it of *public money of a State or any political subdivision* thereof, give security for the safe-keeping and prompt payment of the money so deposited, *of the same kind as is authorized by the law of the State* in which such association is located in the case of other banking institutions in the State."

Under the provisions of Section 205 of the State Banking Law, Consol.Laws, c. 2, "The superintendent [of Banks] shall have power to receive from every national bank which has been granted a special permit by the federal reserve board to act in a fiduciary capacity under the provisions of the federal reserve act [Section 11(k), 12 U.S.C.A. § 248(k)], a deposit of securities of the kind and in the amount which would be required of a trust company having the same capital and located in a place of the same population under the provisions of section ninety-five of this chapter. Such securities shall be registered in the name of the *superintendent of banks* of the state of New York as trustee for the beneficiaries of private and court trusts held by such national bank, and securities so deposited shall be held for the protection of such private and court trusts and subject to sale and transfer, and to the disposal of the proceeds thereof by the superintendent only on the order of a court of competent jurisdiction; * * * *."

By section 4(8) of the State Finance Law of New York, Consol.Laws, c. 56, the Comptroller of that state, upon certain conditions, is authorized to designate depositaries of "funds or moneys paid into court." So far as here applicable, the statute is this " * * · The comptroller shall not designate as a depositary of funds or moneys paid into court any trust company, bank, banking association or banker, nor authorize any deposit in any such depositary of funds or moneys paid into court, until the comptroller shall have required such depositary to execute to the people of the state an undertaking providing for the payment of a rate to be agreed upon, and in such form as the attorney-general shall prescribe, and in an amount to be approved by the county judge of the

county where such trust company, bank, banking association or banker is located, and by the comptroller. Such undertaking shall be filed in the office of the comptroller and *shall be secured by a deposit of bonds as provided in section 10* of this article."

Section 10 of the State Finance Law specifies that the collateral to be pledged shall consist, among other things, of United States bonds and of those of the State of New York.

On February 18, 1930, the Federal Reserve Board granted the Bank's application, under Section 248(k), and thereupon the Bank sought to qualify as a depositary under the State Law. While this section is relied upon and pressed by counsel for the defendants, the proof is clear (as shown by the exhibits) that these defendants did not act under 12 U.S.C.A. § 248(k) but under Section 90. By this is meant that the pledged collateral was handled in accordance with the requirements of the State Finance Law, and not under the State Banking Law.

In due course, and upon the attempted compliance with the requirements of the State Finance Law, the Bank executed its undertaking for its proper performance "of all things required by law to be done and performed in reference to funds and money paid into (State) court." As collateral thereto, the Bank pledged state and national bonds with the State *Comptroller,* and these finally were of the par value of $115,000.

When these matters had been accomplished, the Chamberlain of the City of New York opened an account with the Bank for the deposit of State Court funds which, under appropriate orders, came into his official possession and control. Upon the books of the Bank, the account was designated "Chamberlain of the City of New York—Court and Trust Funds." Deposit and withdrawals continued over the years until August 14, 1937, at which time the Comptroller of the Currency of the United States announced the Bank's insolvency, and plaintiff was appointed its Receiver. As of that day the account of the Chamberlain showed a credit balance of $114,325.07.

The moneys in the account had been paid into State Court pursuant to a variety of local statutes (Civil Practice Act Sections 133–137). For the most part, however, the beneficial owners were "wards of the court," as for example, infant plaintiffs who had secured recoveries in personal injury actions (Civil Practice Act, Section 980-a). In order to protect such funds, the State has evolved an elaborate scheme of supervision, examination, audit and control under the direction of its comptroller; and, by virtue of Section 1311 of McKinney's Unconsolidated Laws, a political subdivision may ultimately become responsible for the safety of such court or trust funds. Withdrawals from a particular account are made only upon the presentation and filing with the City Treasurer of an order of the court originally having authority over the sum to be withdrawn (Rule 32 of the Rules of Civil Practice). If the Treasurer, in good faith, and acting in pursuance of such order, releases funds in his possession, he is without liability in the premises (Civil Practice Act, § 137).

Upon the Bank's failure, the State Comptroller, and acting in the best of faith, hastened to sell the collateral which had been pledged with him to secure the account. From the sum realized upon the sale, the Comptroller paid to the City Treasurer the full face amount of his account, together with interest thereon. This money was deposited in other designated depositaries, and, since then, portions of it, under appropriate court orders, have been disbursed to the parties entitled thereto.

In an effort to recover all assets of the Bank and upon the theory that the Bank's pledge of bonds to secure its undertaking to the State Comptroller was ultra vires, null and void, the Receiver comes into court, and asks for a decree to that effect, and that defendants personally be held to accountability.

The case is presently before the Court upon defendants' motions for a dismissal of the complaint. These are predicated upon the ground that the pleading fails to state a claim for relief against them; and alternately, it is asked that defendants have a summary judgment in their favor, there being no dispute as to the facts.

The motions tender the following issues: (1) That the subject matter of the action is now within the jurisdiction of the state courts, and that this court is without authority to act in the premises; (2) that, in reality, the action is against the State of New York, or one of its political subdivisions, and that, for such reason, this court is without jurisdiction; and furthermore that under no circumstances can defendants be held individually liable; (3) that the pledge was lawful, in that it

was made to secure "public money" within the meaning of those words as used in 12 U.S.C.A. § 90; or, if not, the pledge was lawful under 12 U.S.C.A. § 248(k); (4) that recovery cannot be had inasmuch as the plaintiff has not made restitution, and is estopped from holding defendants to accountability.

■ Taking up these propositions, it is to be observed that plaintiff does not seek to recover court and trust funds that were on deposit with the Bank, and which may have been within the jurisdiction of the State courts. On the contrary, the theory of the action is that neither the bonds nor their proceeds were ever lawfully in the hands of the defendants, or any of them.

Nor is this action one against the State of New York. If plaintiff prevails, the pecuniary interests of the State will not be affected, and the State's presence herein as a party is neither necessary nor indispensable.

■ Although, as has been indicated, the City of New York is responsible for all funds or moneys deposited with the Chamberlain, the statute (Section 1311 of McKinney's Unconsolidated Laws), fixing such liability, limits the action to the party aggrieved and to the Comptroller of the State of New York. In Banks v. Jacoby & Sons, 1936, 246 App.Div. 841, 285 N. Y.S. 144, it was held that the purpose of the statute was to hold officials to responsibility for funds intrusted to their custody of infants and other wards of the court. Plaintiff is not within either of these categories. It had no funds on deposit with the Chamberlain, and, unless the proceeds of the bonds can be traced into the possession of the City, I doubt whether plaintiff has any other rights of action against the City. But, assuming that such right exists in the plaintiff, and suable as the City is, the F.D.I.C. was under no obligation to make it a party defendant. The real parties in interest are plaintiff and the defendants as individuals. The fact that the latter acted officially, and in the utmost good faith, does not necessarily relieve them. With their official acts, plaintiff has no concern. If, in what they did, they exceeded the authority with which they were vested, and unintentionally converted property which the Bank was without the right to pledge, they have laid themselves open to liability. In such

a situation, the suit is not against the State, either actually or constructively.

The contention that defendants, being concededly innocent of the violation of any state law, cannot be held liable for having performed their official duties, cannot be sustained. As heretofore stated, the essence of the charge is that defendants, to the detriment of a national banking institution, intermeddled with its assets, and in contravention of federal law that was designed to prevent preferences as between depositors. Upon more than one occasion, officers of a state have been successfully sued for the recovery of property illegally in their possession, Evale v. Tremaine, D.C., 22 F.Supp. 171; Adams v. Cribbis, D.C., 17 F.Supp. 723. The rule of these decisions appears to be applicable here. Furthermore, the circumstance that any liability that may be imposed upon defendants may perhaps, under Section 1311 of McKinney's Unconsolidated Laws, be imposed upon the State, does not affect the Receiver's right to assert its claim against public officials who may have acted improperly.

■ Finally, the recent case of City of Yonkers v. Downey, 309 U.S. 590, 60 S.Ct. 796, 84 L.Ed. 964, is complete refutation of the contention that the Receiver is estopped to proceed further, for the reason that he made no tender of repayment of such of the deposited funds as came into its possession.

■ Consideration will now be given to defendants' claim that the pledge was valid under the authority of 12 U.S.C.A. § 248 (k), or under the National Bank Enabling amendment of June 25, 1930, which constitutes the second paragraph of 12 U.S. C.A. § 90, both of which statutes have been quoted supra. These acts are curative and remedial. Their purpose was to place national banks in competitive equality with state banking institutions, McNair v. Knott, 302 U.S. 369, 58 S.Ct. 245, 82 L.Ed. 307; Lewis v. Fidelty & Deposit Company, 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425, 92 A.L.R. 794.

So far as Section 248(k) is concerned, I am of opinion that it afforded the Bank no justification for making the pledge. The reason is that the State Comptroller, in designating the Bank as a depositary and in receiving the pledge, was not acting under the section of the statute just mentioned. The state statutes there ap-

plicable under federal law are found in the State Banking Law, Section 205 (quoted supra), which requires a bank, when acting as a depositary of court trusts, to be designated by the superintendent of banks, and it is he, and not the State Comptroller, acting under the State Finance Law, who is to require the pledge of collateral that is to serve as security for the deposits. Defendants acted under the law last mentioned, and the undertaking and pledge agreements so recite. It will be seen, therefore, as respects the pledge of the Bank, that there was no compliance with Section 248(k), and the case must stand under Section 90 of 12 U.S.C.A.

The State Comptroller, in selecting banks to serve as depositaries, is limited by the provisions of Section 4(8) of the State Finance Law, quoted supra.

■ Now the validity of the pledge depends exclusively upon the powers granted to national banks by Congressional enactment. That a national bank may not pledge its assets to secure its deposits in the absence of such statutory authority is well established, Texas & Pacific R. R. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777; City of Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787; City of Yonkers v. Downey, supra, 309 U.S. 590, 60 S.Ct. 796, 84 L.Ed. 964. The leading cases in New York are State Bank of Commerce v. Stone, 261 N.Y. 186, 184 N.E. 750, 87 A.L.R. 1449; Mount Vernon v. Mount Vernon Trust Company, 270 N.Y. 400, 1 N.E.2d 825; and New Rochelle Trust Company v. White, 283 N.Y. 223, 28 N.E.2d 387.

■ A case somewhat similar to this is Mermis v. Jackson, 10 Cir., 93 F.2d 579, 583. It was there held that under state statutes and decisions of the courts of Kansas, public moneys included funds of the type here deposited by the City Chamberlain. In writing the opinion of the Court, Judge Phillips said that the phrase "public money of a State or any political subdivision thereof" should be liberally construed. It is my thought, however, in the light of subsequent decisions, that I should not follow the case of Mermis v. Jackson. It seems to me that "public moneys" within the contemplation of Section 90 includes only those funds in which the beneficial title and right is in the State or its political subdivisions. To my mind, the words do not comprehend moneys in which legal title thereto may be in a municipal officer acting in his official capacity, and which are held for the benefit of private persons, Hood v. Hardesty, 4 Cir., 94 F.2d 94, certiorari denied 303 U.S. 661, 58 S.Ct. 765, 82 L.Ed. 1120. See 1933 Opinions of the New York State Attorney General, 191; 1934 Opinions of the New York State Attorney General 131.

■ The rule of Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not apply here. The phrase in 12 U.S.C.A. § 90, "public money of a State" or any political subdivision thereof, is that of Congress, and is to be construed in accordance with the meaning intended by the national legislature. In my judgment, these words mean merely that if a state requires "public money," in the generally accepted meaning of those words, to be secured by a pledge of collateral by a state bank in which they are deposited, national banks will then have similar authority to secure deposits of such moneys, in the same manner as state banking institutions. Neither state courts nor legislatures, by decision or statute, can expand the generally accepted meaning of "public money," as intended by a statute which regulates the powers of national banks. Note must also be taken that state banks of New York have not been given the general power to secure deposits. New Rochelle Trust Company v. White, supra, 283 N.Y. 223, 28 N.E.2d 387; Mount Vernon v. Mount Vernon Trust Company, supra, 270 N.Y. 400, 1 N.E.2d 825.

As recently as April 1940, the Supreme Court of the United States has said in the City of Yonkers v. Downey case, supra, 309 U.S. 590, 60 S.Ct. 796, 799, 84 L.Ed. 964: "A national bank has no inherent power to secure deposits, public or private, by pledging assets, and that such a pledge is both ultra vires and contrary to public policy. 'The measure of their powers is the statutory grant; and powers not conferred by Congress are denied.' Also, that in case of insolvency, assets so pledged, may be reclaimed without payment of the deposits. 'To permit the pledge would be inconsistent with many provisions of the National Bank Act which are designed to ensure, in case of disaster, uniformity in the treatment of depositors and a ratable distribution of assets.' *The results in these cases was [sic] not influenced by consideration of local law.*" (Italics supplied.)

■ Notwithstanding sympathetic consideration of the defendants' arguments, I am constrained to hold that, under the pertinent statutes and decisions, the pledge made by the Bank was ultra vires and void.

Defendants' motions must be denied.