## FEDERAL DEPOSIT INS. CORPORATION v. TREMAINE et al.

### No. 140.

Circuit Court of Appeals, Second Circuit.

Feb. 4, 1943.

John J. Bennett, Jr., Atty. Gen., of New York, William C. Chanler, Corp. Counsel of City of New York, Berle & Berle, and Adolf A. Berle, Jr., all of New York City (James S. Regan, Howard F. R. Mulligan, and Hyman Wank, Asst. Attys. Gen., and Seymour B. Quel, Bernard Newman, Hortense M. Wittstein, and Winthrop H. Kellogg, all of New York City, of counsel), for appellants.

Sidney R. Nussenfeld, of New York City (Francis C. Brown, and Russell D. Miller, both of Washington, D. C., on the brief), for appellee.

Before L. HAND, CHASE and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by the defendants from a summary judgment, holding them liable for the conversion of certain bonds which had belonged to the Fort Greene National Bank of Brooklyn, N. Y. and which it had pledged as security for deposits made with it. The deposits were of moneys which had been paid into state courts in actions between private persons: payments for the benefit of infants in actions for personal injuries, or of beneficiaries of trusts, or the like. The Comptroller of New York had designated the bank as a depositary of court funds under § 44-c of the New York State Finance Law, Consol.Laws, c. 56, and the bank had delivered to him $115,000 in bonds to secure the deposit of such funds. The bank became insolvent, the Comptroller sold the bonds and transmitted the proceeds to that one of the other defendants who chanced at the time to be acting as Chamberlain of the City of New York, or as its City Treasurer; and these proceeds that official either deposited in another bank, or paid out to the persons entitled. The theory of the action, which was brought by the bank's receiver is that the bank had no authority to pledge the bonds under the amendment of 1930 to § 90 of Title 12 U.S.C.A., 46 St.L. 809; and that the defendants in dealing with them or with their proceeds were guilty of conversion, and made themselves personally liable. So the district court held upon motion for summary judgment, and the defendants have appealed. The only question which we need discuss is whether the pledge was valid, since if it was, the defendants were justified in their dealings with the property.

It is indeed settled law that a national bank, unless expressly so authorized, has no power to pledge its assets as security for any deposit, and that the pledge is void. Texas & Pacific Ry. Co. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777; City of Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787; Yonkers v. Downey, 309 U.S. 590, 60 S.Ct. 796, 84 L.Ed. 964. Section 90 of Title 12 U.S. C.A., however, created an exception; it directed the Secretary of the Treasury to "require" any national banks which he designated as "depositaries of public money * * * to give satisfactory security, by the deposit of United States bonds and otherwise, for the safekeeping and prompt payment of the public money deposited with them." So § 90 stood from the time of its enactment in 1864 until 1930, and up to that time the pledge here at bar would have been undoubtedly void. In that year, however—avowedly in order to enable national banks to compete with state banks for the deposit of the "public money" of the states in which they did business—§ 90 was amended by providing that a national bank might also, "upon the deposit with it of public money of a State or any

political subdivision thereof, give security * * * of the same kind as is authorized by the law of the State * * * in the case of other banking institutions in the State." Since the bonds pledged by the insolvent bank in the case at bar were of the same kind as those authorized by the State of New York in the case of New York banks (§ 4, sub. 8, State Finance Law of New York), the question resolves itself into whether the deposits were of "public money." The Fourth Circuit held in Hood v. Hardesty, 94 F.2d 26 that that phrase was to be determined as a federal question: i. e., that Congress did not mean to make it dependent upon whether the deposits secured were deemed "public money" according to the law of the state where the security was given. We agree; the only condition upon the privilege which depends upon state law is that state banks shall be "authorized" to give security in similar cases, and there is no reason to import any other. Conceivably a state may "authorize" its banks to give security for deposits, although it does not consider the deposit as "public money"; a national bank would be "authorized" to give similar security, provided Congress should be deemed to regard the deposit as "public money." Conceivably, a state may "authorize" its banks to give security for deposits which it considers as "public money" but which Congress should not be deemed so to regard; a national bank would not be "authorized" to give similar security.

There can be no doubt that the deposits here involved were "public money," if we follow what the Supreme Court actually decided in Inland Waterways Corporation v. Young, 309 U.S. 517, 60 S.Ct. 646, 84 L.Ed. 901 and Woodring v. Wardell, 309 U.S. 527, 60 S.Ct. 652, 84 L.Ed. 908. In the first of these cases a national bank had pledged bonds to secure three deposits: one, that of the Inland Waterways Corporation; another, that of the Fleet Corporation; the third, that of the Secretary of War on behalf of the Canal Zone; and a majority of the court held that the pledge was valid as to all three accounts. The deposit of the Inland Waterways Corporation was made up of its own funds, and the only question was whether it made a difference that the depositor was not the United States, but a corporation all of whose shares it owned. So far the decision did not touch the issue here at bar. The Fleet Corporation,

however, had two deposits: one, made up of its own money, like the deposit of the Inland Waterways Corporation; but the other—called the "Agent Good Faith Deposit Account"—made up of moneys paid as security for the "performance of sales or purchase proposals submitted" to the Fleet Corporation; that is of the money of bidders for contracts to purchase vessels from the Corporation. Those bidders who were not awarded any contract were entitled to reclaim their deposits—the money belonged to them. Those to whom contracts were awarded were not so entitled; if they performed, it became part of the purchase price; if they defaulted, it was forfeited. Thus a part—presumably much the greater part—of this deposit was beneficially that of private persons. The deposit of the Canal Zone was made up, substantially in whole, of money deposited by individuals for money orders, or as postal savings deposits. The United States was liable to make good any deficiency of the "Good Faith" deposit of the Fleet Corporation and of the money order and postal savings deposits of the Zone, just as the City of New York was liable for any deficiency of the court funds deposited in the insolvent bank now at bar. Chapter 186, § 1, of the Laws of 1908, as amended by Chapter 185 of the Laws of 1927. Moreover, it was plainly as much a governmental function for the state to receive moneys paid into court, as for the United States to receive the earnest money of bidders for its ships, or postal savings deposits and payments for money orders. There can be no more purely governmental function than the maintenance of courts and the care and distribution of moneys collected by litigation for wards of the court.

When therefore the court held valid the pledge which secured all these deposits indiscriminately, it necessarily held as to the "Agent Good Faith" fund of the Fleet Corporation and as to the Canal Zone deposits, that money in which only private persons had any beneficial interest might be "public money." It could do so, so far as we can see, only because the United States was liable for any deficiency, just as the City of New York was liable for the deficiency here. The plaintiff answers that even so, the court had no such theory in mind, but meant to decide no more than that the moneys of a corporation owned by the United States were moneys of the United States. The chief argument un-

doubtedly was that the difference was only formal between money held by the United States and money held by a corporation all of whose shares it owned. The primary cleavage was as to whether the statute should be read literally, and the decision must be taken at least as insisting in general upon a liberal interpretation. That alone seems to us to go far towards the result we reach; but in addition it was most unlikely—if anyone had supposed that there was a valid distinction between money beneficially owned and money privately owned for which the United States was liable—that the minority should not have used it as an argument for affirming at least so much of the decision below. Again, when Mr. Justice Frankfurter spoke of the funds as "for all practical purposes, Government funds; the losses, if losses there be, are the Government's losses" (page 524 of 309 U.S., page 650 of 60 S.Ct., 84 L.Ed. 901), it is hard to believe that he was not including those accounts whose loss would be a government loss, although the government had no beneficial interest in them. For these reasons we believe that we should not resort to the expedient, at best of extremely dubious propriety, of saying that although the court decided the point, it really did not mean to do so.

 We should ourselves independently have reached the same result. The situation is the usual one of creditor, principal and surety, in which the principal gives security. When as here the surety is certain to be solvent, he is the only party interested in the security upon the principal's insolvency, as is manifest from the fact that if the surety pays he may avail himself of the security. § 141(b), Security, American Law Institute, Restatement of the Law. In the case at bar, although the original deposit could not have been used for ordinary governmental purposes, upon the only occasion when the security could become important—the bank's insolvency—the money which would pay the deficiency, would be "public money" in the strictest sense; and it seems to us not unduly to strain the language to think of that money as becoming a substitute for the original deposit, and therefore as itself a deposit secured. Certainly, it makes not the slightest practical difference to the losers—the taxpayers— whether they must make up a deficiency to private persons, or whether they lose money collected for the general purposes of government. No intelligible public policy which would require security in one case would not require it in the other. Moreover, we should otherwise defeat the underlying purpose of Congress, which was to allow national banks to compete with state banks on equal terms for the deposits of states, cities and the like. Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 564, 565, 54 S.Ct. 848, 78 L.Ed. 1425, 92 A.L.R. 794; Fidelity & Deposit Co. v. Kokrda, 10 Cir., 66 F.2d 641, 642. As we have suggested, it is conceivable that there may be deposits which a state regards as public and which Congress would not, and, if there are, perfect parity has not been secured; but that disparity is not likely to be serious, and the failure to realize the purpose with theoretical perfection, should not excuse a failure to realize it so far as we can. There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it.

The decision of the Tenth Circuit in Mermis v. Jackson, 93 F.2d 579, is on all fours, for the plaintiff is mistaken in seeking to dismiss it merely as an interpretation of the Kansas statute. Judge Phillips had to show that that statute "authorized" a Kansas bank to pledge security for such deposits because that is a condition upon § 90; the earlier part of his opinion was directed only to that. Nor is either Branch v. United States, 100 U.S. 673, 25 L.Ed. 759; or Coudert v. United States, 175 U.S. 178, 20 S.Ct. 56, 44 L.Ed. 122, contrary to our conclusion. In each the plaintiff was the owner of property which had been seized and sold pending forfeiture proceedings which ended in his favor. The proceeds were deposited in a bank which was a designated depositary for "public money," and which became insolvent before the final decree exonerating the property was entered, and the unsuccessful action against the United States was based upon the theory that the money had been covered into the Treasury. In Branch v. United States the proceeds had been paid into court and the clerk deposited them in the bank without any authority of the Secretary of the Treasury, and without warrant of law. In Coudert v. United States, the marshal had done the same thing, but the plaintiff invoked as a distinction a later statute which justified depositing such proceeds with the Assistant

Treasurer of the United States. The court reserved judgment as to what it would have decided, had the marshal followed the statute, holding only that, since he had not, the case did not differ from Branch v. United States. Neither of these decisions is relevant here. The only thing decided, or which could have been decided, was whether the United States was liable and it could be liable only in contract, "express or implied". § 41(20) and § 250, Title 28 U.S. C.A. It was necessary to decide no more than whether the United States had actually taken property to which it had no title. United States v. Great Falls Manufacturing Co., 112 U.S. 645, 5 S.Ct. 306, 28 L.Ed. 846. No question could arise as to whether, if it had taken over such money, it would have been "public money" within § 90. So far as appears, it would have been, had the United States been liable at all; and any expressions in either opinion as to "public money" are to be read in that light.

Judgment reversed; complaint dismissed.