Sucesión de Pedro Giusti, Inc., peticionaria, *v.* Tribunal de Contribuciones de Puerto Rico, demandado; Rafael Buscaglia, Tesorero de Puerto Rico, interventor.

Núm. 195.—*Sometido:* Abril 18, 1949. *Resuelto:* Junio 23, 1949.

118

*Córdova & González* y *Hernán R. Franco,* abogados de la peticiona-
ria; *Hon. Procurador General Vicente Géigel Polanco (José C.
Aponte, Procurador General Interino,* en el alegato) y *J. B.
Fernández Badillo, Procurador General Auxiliar,* abogados del
interventor, querellado en el pleito principal; *Rafael O. Fer-
nández,* como *amicus curiae.*

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

La cuestión envuelta en este recurso es si las acciones de una corporación doméstica en manos de sus accionistas están sujetas al pago de nuestra contribución sobre la propiedad.

A solicitud de la Sucesión de Pedro Giusti, Inc., corporación doméstica, expedimos el auto de *certiorari* para revisar la decisión del Tribunal de Contribuciones sosteniendo la determinación hecha por el Tesorero al efecto de que debe pagar para el año 1945–46 contribuciones sobre la propiedad ascendentes aproximadamente a $3,800 sobre acciones de otras corporaciones domésticas de las cuales la contribuyente era dueña el 15 de enero de 1945, y que estaban valoradas aproximadamente en $140,000.

■ Las acciones están sujetas a contribución sobre la propiedad en manos de accionistas en virtud de los artículos 285 y 290 del Código Político.(¹) Pero el artículo 291(*d*) dispone la exención contributiva de *"Las acciones del capital de . . .* corporaciones *. . .* organizadas bajo las leyes de Puerto Rico, cuando la propiedad de tales corporaciones esté exenta o *cuando dichas acciones sean tributables* a dichas *. . . corporaciones . . .* , con las limitaciones y en la forma que dispone el artículo 316 de este Título." (Bastar-

---

(¹) El Código Político, aprobado en 1902, incluye el Título IX, intitulado Rentas. El Capítulo I de este Título, intitulado Tasación de la Propiedad, consiste de los artículos 285 al 355. La mayor parte de los artículos envueltos en este caso fueron enmendados por la Ley del 10 de marzo de 1904, Leyes de Puerto Rico, 1904, pág. 154. Cuando citamos estos artículos, nos referimos a la versión que de los mismos contiene la Compilación de los Estatutos Revisados y Códigos de 1911, págs. 577–605.

El artículo 285 provee una contribución "sobre el valor de todos los bienes inmuebles y muebles de Puerto Rico, y de todos los bienes de personas residentes en Puerto Rico, que se averiguará y que más adelante no estuvieren exentos de contribución."

El artículo 290 prescribe que "toda propiedad no exenta expresamente del pago de contribuciones será tasada como imponible." Luego de definir los bienes inmuebles a los fines de esta contribución, el artículo 290 provee que bienes muebles incluirán, entre otras cosas, acciones; pero que "no comprenderán los créditos en cuentas corrientes, pagarés, ni otros créditos personales."

dillas nuestras).(²) La cuestión primordial a resolver en este caso es si las acciones de las cuales es dueña la peticionaria están exentas por el fundamento de que "dichas acciones son tributables a dicha corporación."

■ Al oponerse a esta exención, el Tesorero arguye que el lenguaje del artículo 291(*d*) es dudoso o ambiguo. Pone gran énfasis en la bien establecida proposición de que las exenciones contributivas no pueden inferirse; deben proveerse expresamente en lenguaje claro e inequívoco, que se interpretará restrictivamente. *Puerto Rico Ilustrado* v. *Buscaglia, Tes.*, 64 D.P.R. 914, 918; *Crown Beverages* v. *Buscaglia, Tes.*, 65 D.P.R. 814, 818, escolio 5; *Ochoa Fertilizer Corp.* v. *Tribunal de Contribuciones,* 68 D.P.R. 424, 431–32; *Buscaglia* v. *Tribunal de Contribuciones,* 68 D.P.R. 37, 39, y casos citados. Pero la materia contributiva es complicada. Frecuentemente el lenguaje de leyes contributivas es necesariamente complejo y difícil de entender. No tenemos derecho a destruir la intención de la Asamblea Legislativa diciendo que determinado lenguaje es ambiguo sencillamente porque éste es complicado. Por el contrario, nuestra misión es averiguar, de sernos posible, la verdadera intención de la Legislatura. *Destilería Serrallés, Inc.* v. *Tribunal de Contribuciones,* ante, pág. 69. Además, si bien el artículo 291(*d*) está redactado en el lenguaje de exención, éste no es un problema típico de exención contributiva. Es más bien, como veremos luego, una cuestión de si la Legislatura afirmativa y expresamente tuvo la intención de imponer contribuciones tanto a los bienes de corporaciones domésticas como a las acciones de sus accionistas, o solamente a uno de los dos.

(²)Este artículo fué originalmente aprobado en 1902 en el idioma inglés. Por consiguiente hemos sustituído la versión española con una traducción corregida.

La versión española de 1902 incluye una referencia al artículo 322. Pero esto es erróneo ya que la versión inglesa de 1902 no tiene tal referencia. En igual forma, las referencias al artículo 322 de la versión española de las Compilaciones de los Estatutos y Códigos Revisados de 1911, pág. 582, y de 1941, pág. 403, no debieron haberse incluído.

El próximo punto que discuten las partes es la cuestión de "doble contribución". El Tesorero no cuestiona la proposición de que la intención legislativa al imponer doble contribución debe ser clara y explícita y nunca se presume. *P. R. & Am. Ins. Co.* v. *Gallardo, Tes.*, 35 D.P.R. 917, 929-30, discutido en detalle más adelante sobre otros puntos; *Pueblo* v. *Irizarry,* 46 D.P.R. 898; *Tennessee* v. *Whitworth,* 117 U.S. 129; *Leader* v. *Glander,* 77 N.E.2d 69 (Ohio, 1948); 14 Fletcher, *Cyclopedia Corporations,* sec. 6939, pág. 598. Sin embargo, el Tesorero sostiene que la imposición de contribuciones sobre los bienes de la corporación a la corporación misma y la imposición de contribuciones sobre sus acciones a los accionistas, no constituye doble contribución. Por tanto, de conformidad con el Tesorero, la doctrina de que la intención de imponer doble contribución debe ser clara y explícita no es de aplicación a este caso.

Pero al considerar este argumento del Tesorero, es importante comprender qué se entiende por "doble contribución". Dicha frase tiene distintos significados, dependiendo del contexto en que se use. En primer lugar, en algunos estados se usa al interpretar una inhibición constitucional contra doble contribución. Haglund, *Double Taxation,* 8 So. Calif.L.Rev. 79, 80, citando casos en el escolio 5. Pero aquí dejamos a un lado esa cuestión, ya que no existe prohibición constitucional alguna contra doble contribución por nuestra Legislatura. *Monllor & Boscio, Sucrs.* v. *Sancho, Tes.,* 61 D.P.R. 67, 69-70, confirmado en 136 F. 2d 114 (C.C.A. 1, 1943).

La segunda forma de usar esta frase es al determinar si existe doble contribución en el sentido estrictamente legal. De igual manera esto no presenta problema alguno en este caso. Las partes convienen en que *legalmente hablando* el imponer contribución a los bienes de una corporación y a las acciones en manos de sus accionistas no constituye doble contribución, ya que tales contribuciones se imponen sobre dife-

rentes personas y sobre diferentes bienes. *Bank of Commerce* v. *Tennessee*, 161 U. S. 134, 146; *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664; *Hawley* v. *Malden*, 232 U. S. 1; *Klein* v. *Board of Supervisors*, 282 U. S. 19; *Annotation*, 43 A.L.R. 686, 694, 700; 58 L.R.A. 513, 589 *et seq.;* 60 L.R.A. 321, 366–67; 7 Ann. Cases 1195; 14 Fletcher, supra, sec. 6939, págs. 598–99; Ballantine *on Corporations*, sec. 122, pág. 292; *Monllor & Boscio, Sucrs.* v. *Sancho, Tes.*, supra, pág. 70 *et seq.; P. R. Iron Works* v. *Buscaglia, Tes.*, 62 D.P.R. 869, 880–82; *Barceló & Cía., S. en C.* v. *Buscaglia, Tes.*, 67 D.P.R. 108, 117, confirmado en 169 F. 2d 82 (C.C.A. 1, 1948).

Los casos antiguos usaron el concepto de "doble contribución" en una tercera acepción. Aun cuando (1) no existía prohibición constitucional contra doble contribución y (2) no había doble contribución en el sentido estrictamente legal, dichos casos designaron como "contribución doble" aquellas contribuciones que en virtud de su impacto económico eran doble en el sentido amplio de la palabra. Dichos casos no dijeron que tales contribuciones no podían imponerse válidamente. Pero sí exigían que la intención de imponerlas fuera clara y explícita.

■ Esta tercera acepción de "doble contribución" es de aplicación al presente caso. En 1902, cuando se aprobó nuestro estatuto, muchas leyes estatales impusieron contribuciones bien a propiedad corporativa o a las acciones en manos de los accionistas, pero no a ambas. Su teoría era que la contribución a las dos, aun cuando fuera válida, sería doble contribución en el sentido económico. Haglund, *Double Taxation*, 8 So.Calif.L.Rev. 79, 83–84, citando casos de varios estados en los escolios 10, 11; 35 Ill.L.Rev. 716, 727; Fordham y Lob, *Some Plain Talk About the Louisiana General Property Tax*, IV La.L.Rev. 469, 473, escolio 11; 14 Fletcher, supra, sec. 7000, págs. 860–61. Y los artículos perti-

nentes de nuestro Código Político obviamente se modelaron a la luz de leyes similares de dicha era.

Citando los casos de *Tennessee* v. *Whitworth,* supra, y *Board of Com'rs. of Oklahoma County* v. *Ryan,* 232 P. 834 (Okla., 1925), en 14 Fletcher, supra, sec. 6939, pág. 598, se sintetiza este punto de vista como sigue: "En muchos estados, las leyes expresamente disponen que las acciones no son tributables en manos de accionistas si los bienes de la corporación son tributados a la corporación en el estado. Tales estatutos tienen la intención de evitar la doble contribución. Las leyes no se interpretarán como que autorizan la tributación tanto de la propiedad de la corporación como de las acciones del accionista individual, a no ser que la intención de la Legislatura a ese efecto se exprese de manera clara e inequívoca."

El *amicus curiae* sugirió en la vista oral que nuestra ley se asemejaba más al estatuto de Pennsylvania que a cualquiera otro.([3]) Nuestra búsqueda nos ha indicado que Pennsylvania era uno de los estados que empleó el anterior enfoque a este problema a fines del siglo. Su estatuto, aprobado en 1891 y enmendado en 1893, imponía contribuciones a las "acciones . . . excepto aquéllas de cualquier corporación o sociedad de responsabilidad limitada que estuviera sujeta a la contribución sobre el capital (*capital stock*) . . ." En el caso de *Commonwealth* v. *Fall Brook Coal Co.,* 26 Atl. 1071 (Pa., 1893), la corte resolvió que bajo esta ley no podía imponerse contribución a las acciones de una corporación doméstica en manos de sus dueños si la corporación había pagado la contribución sobre el capital. En el curso de su opinión la corte dijo a las págs. 1071–72 que la propiedad de una corporación, como la de un fideicomiso, es "un solo cuerpo" al cual "muy bien puede imponérsele contribuciones a nombre de la corporación, del dueño legal, o a nombre de los accio-

---

(3) Otros nos han asegurado que nuestra ley fué redactada tomando como modelo el estatuto de Montana. Véase *Daly Bank & Trust Co.* v. *Board of Com'rs.,* 81 P. 950 (Mont., 1905).

nistas, los dueños en equidad . . . No importa el método que se emplee, se llega hasta el mismo capital, y el efecto de dicho pago alcanza a las mismas personas. En consecuencia, es claro que el imponer contribución al capital en manos de la corporación, y luego imponer contribución a los dueños de las partes o acciones en que éste se divide, sobre sus participaciones respectivas en el mismo capital, equivale a una doble contribución, pura y simple.''

La corte continuó expresándose entonces (pág. 1072) "que la legislatura tiene poder para imponer doble contribución . . . Pero no se presumirá la intención de imponer doble contribución. *Safe—Deposit Co.* v. *Loughlin*, 139 Pa. St. 612, 21 Atl. 163. La presunción es contra la existencia de tal intención, y esta presunción prevalecerá hasta que sea eliminada por palabras expresas demostrativas de la intención de imponer doble contribución.'' Y véanse, *Notes*, 88 U.Pa. L.Rev. 456, 458; 88 U.Pa.L.Rev. 758.

Hay otro ejemplo de este antiguo enfoque contra la doble contribución en su efecto económico. Algunas constituciones estatales proveyeron que toda la propiedad pagará contribuciones, incluyendo las acciones. No obstante tales disposiciones constitucionales, la mayoría de las cortes concluyó que el no haber la Legislatura impuesto contribuciones a los intereses de los accionistas, o aun haber provisto exenciones estatutarias para los mismos, no violaba tales constituciones estatales. Aquí también la teoría de las legislaturas y las cortes fué que una contribución sobre los bienes de la corporación era en efecto práctico una contribución sobre las acciones de los accionistas, y que imponerle contribución a ambos equivaldría a imponer contribución a la misma propiedad dos veces. *Comments, Corporate Stock and the Louisiana Property Tax*, IV La.L.Rev. 110, 113, citando casos de varios estados en los escolios 15 y 17; *Crocker* v. *Scott*, 87 Pac. 102 (Calif., 1906); *Cheeseborough* v. *City and County of San*

*Francisco,* 96 Pac. 288 (Calif., 1908); Stimson, *Exemption From the Property Tax in California,* 21 Calif.L.Rev. 192, 200, 204–5, 220; *Note,* 16 Calif.L.Rev. 301, 304–5.([4])

Visto lo anteriormente expuesto, precisa aplicar a este caso el principio de que si bien es válida la doble contribución, existe una presunción contra ella y debe imponerse expresa y claramente. Como hemos visto, el Tesorero arguye que esta doctrina no es de aplicación aquí, porque diferentes contribuciones sobre corporaciones y sus accionistas no son legalmente doble contribución. Pero la fórmula aquí no es legal. Tampoco tiene relación con nuestros actuales puntos de vista. El punto es más bien que las legislaturas de esa época, incluyendo la nuestra, pensaron de las dos contribuciones en cuestión como que constituían, en términos económicos, doble contribución. Por consiguiente debemos determinar que la intención de imponerlas fué clara y explícita.

No estamos sugiriendo que este Tribunal o la presente Legislatura sean del criterio, que prevalecía en muchos sitios hace medio siglo, al efecto de que una contribución sobre los bienes de una corporación y una contribución sobre las acciones en manos de sus accionistas son contribuciones sobre la misma propiedad y por ende constituyen doble contribución, ya sea legal o económicamente hablando. Por el contrario, hoy diríamos, por lo menos a los fines de contribuciones sobre

---

([4])Ejemplo típico del razonamiento empleado para justificar este resultado es el lenguaje del caso de *Burke* v. *Badlam,* 57 Cal. 594, 601–2 (1881): ". . ¿qué constituye las acciones de una corporación sino sus bienes? . . . Cuando . . . toda la propiedad de una corporación es tasada . . . entonces se tasan todas sus acciones, y el mandato de la Constitución se cumple con ello. . . . Cuando la propiedad de una corporación es tasada, y se paga la contribución sobre la misma ¿quién sino los accionistas paga dicha contribución? . . . Tasar toda la propiedad de la corporación . . . y también tasarle a cada accionista el número de acciones que posee, sería, manifiestamente, tasar dos veces la misma propiedad . . . la Legislatura . . . no ha tratado de eximir propiedad alguna de contribución . . . Sólo ha dicho que la propiedad será tasada a la corporación, y no será tasada nuevamente . . .".

la propiedad, que una "corporación es 'dueña' de su activo; el accionista es 'dueño' de sus acciones". 35 Ill.L.Rev. 716, 717, 723. Pero no estamos interpretando una constitución, en la cual el mismo lenguaje debe interpretarse en cada generación de conformidad con las necesidades de su época. Es un estatuto contributivo que está sujeto a enmiendas y que se redactó a la luz de como se pensaba en 1902. Para determinar su significado debemos cerciorarnos, de ser posible, de lo que tenían en mente los hombres que lo redactaron en 1902. Sobre ese punto, es significativo el hecho de que si bien no tan diáfanamente claro como el estatuto de Pennsylvania, el artículo 291($d$) sigue la pauta de estatutos estatales de esa época eximiendo las acciones en manos de sus dueños cuando "dichas acciones sean tributables a dichas . . . corporaciones . . . ".

■ Un examen de nuestro estatuto artículo por artículo revela que nuestra Legislatura estaba imbuída con la filosofía de 1902 que hemos descrito. El artículo 291($d$) exime de contribución "Las acciones del capital . . . cuando dichas acciones sean tributables a dichas . . . corporaciones . . . , con las limitaciones y en la forma que disponen los artículos 316 . . . ". Al comenzar este análisis de nuestra ley, debemos confesar que no existe disposición en el Código Político que emplee la terminología exacta del artículo 291($d$) e imponga contribución por sus acciones a la corporación propiamente dicha. Además, el artículo 316, por sí solo, no presta ayuda sustancial alguna, ya que únicamente provee que se tasará la propiedad inmueble de las corporaciones. Pero debemos leer la ley en su integridad. El próximo artículo, el 317, al leerse conjuntamente con el artículo 316, nos brinda la clave en cuanto a la intención de la Legislatura. Dispone la tasación de la propiedad mueble de las corporaciones. Bajo dicho artículo se determina el "capital" de las mismas tomando (1) el valor del "capital" (*capital stock*) más los bonos, sobrante y ganancias no divi-

didas, o (2) el valor de la propiedad inmueble y mueble, el mayor de los dos, luego de deducir el valor de los bienes inmuebles bajo las dos fórmulas.(⁵)

Así vemos que bajo los artículos 316 y 317 toda la propiedad de una corporación doméstica, inmueble y mueble, está sujeta a contribución sobre la propiedad.(⁶) Además, usando el valor del "capital" (*capital stock*), etc., como una de las alternativas como medida del valor de la propiedad mueble, la Legislatura demostró que estaba sustancialmente siguiendo la pauta de leyes estatales que imponen contribución al "capital". Esto se torna aun más evidente cuando nos damos cuenta de que una contribución sobre el "capital" es en efecto una contribución sobre la propiedad de una corporación, y que las cortes emplean los conceptos indistintamente. *P.R. & Am. Ins. Co.* v. *Gallardo, Tes.*, 35 D.P.R. 917, 926–29; Hodes, *The Illinois Capital Stock Tax*, 28 Ill. L.Rev. 332, 337–38; *Notes*, 88 U.Pa.L.Rev. 456, 457; 2 Cooley,

---

(⁵)El artículo 317 prescribe como sigue: "La propiedad mueble de . . . corporaciones . . . incorporadas con arreglo a las leyes de Puerto Rico fuera de las instituciones bancarias con capital en acciones deberá tasarse como perteneciendo a tales . . . corporaciones . . . por el Tesorero de Puerto Rico, en la forma que este artículo provee. El valor efectivo actual *del capital* de las citadas corporaciones, se fijará por el Tesorero de Puerto Rico de conformidad con la declaración jurada de los presidentes, directores u otros funcionarios al frente de tales corporaciones, como se requiere por el artículo 319, o basándolo en cualquier otro informe fidedigno que el Tesorero tenga o adquiera, y el valor efectivo actual no será en ningún caso menos que el valor *del capital* y bonos, más el sobrante y ganancias no divididas de dichas . . . corporaciones . . . ni será menor que el valor en el mercado de los bienes inmuebles y muebles de dichas . . . corporaciones . . . incluyendo en los bienes muebles todos los derechos, franquicias y concesiones. De la tasación obtenida en esta forma se deducirá el valor total de la propiedad inmueble de dichas corporaciones, que resulte de la tasación verificada de acuerdo con las disposiciones del artículo 316; y el resto será considerado como que representa la propiedad mueble de dichas corporaciones que ha de someterse a contribución." (Bastardillas nuestras).

(⁶)Esto está, desde luego, sujeto a la prohibición constitucional contra la imposición de contribuciones por Puerto Rico sobre bienes muebles tangibles pertenecientes a sus domiciliados pero ubicados permanentemente en otro sitio. *Ballester Hermanos* v. *Tribunal de Contribuciones*, 66 D.P.R. 560, 565–6, revocado por otros motivos pero confirmado en cuanto a este punto, 162 F.2d 805, 806 (C.C.A. 1, 1947), *certiorari* denegado 332 U. S. 816.

*Taxation,* 4ta. ed., secs. 869–70, págs. 1754–56; id., sec. 876, págs. 1760–2; *Commonwealth* v. *Union Shipbuilding Co.,* 114 Atl. 257, 258 (Pa., 1921); *Wright* v. *Georgia R.R. & Banking Co.,* 216 U.S. 420, 425; *Delaware, L. & R.R. Co.* v. *Pennsylvania,* 198 U.S. 341, 353–54, 357; 58 L.R.A. 513 *et seq.* Véase 14 Fletcher, supra, secs. 6961–62, págs. 680–91. Según lo indica la Corte de Apelaciones de Nueva York al discutir tal contribución, el capital "es una expresión desgraciada que se ha interpretado como que significa propiedad más bien que acciones del capital . . . ". *People* v. *Cantor,* 141 N.E. 901, 903 (N.Y., 1923).

En vista de lo anterior, podemos, por lo menos a los fines de este caso, tratar la contribución sobre la propiedad, impuesta por los artículos 316–17, como una contribución sobre el capital. Como tal, creemos que la contribución pagada por la corporación bajo los artículos 316–17 era la contribución que la Legislatura tenía en mente cuando dispuso en el 291(*d*) que las acciones de corporaciones domésticas en manos de accionistas estarán exentas "cuando dichas acciones sean tributables a dichas . . . corporaciones . . . ".

El Tesorero echa a un lado el artículo 317 afirmando que meramente dispone la tasación de los bienes muebles de una corporación y no provee en forma taxativa que "dichas acciones sean tributables a dicha corporación" ni impone una contribución al capital. Pero en ningún artículo fuera del 317 aparece mención alguna de tal contribución sobre la corporación propiamente dicha. Por tanto, para convenir con la interpretación del Tesorero del artículo 317 tendríamos que resolver que aquella parte del 291(*d*) que concede esta exención no tiene significado alguno. Sin embargo, nuestro deber es buscarle alguna significación, de ser razonablemente clara, a esta disposición del artículo 291(*d*). Se admite que esta cuestión no está libre de dificultades. Pero es evidente el esfuerzo de la Legislatura de seguir la pauta y filosofía de las leyes estatales de dicha época. No obstante lo poco apro-

piado de parte de su lenguaje, estamos convencidos de que la Legislatura de 1902 tuvo por miras proveer que cuando una corporación doméstica paga las contribuciones provistas en los artículos 316–17, las "acciones" (v.g., según se entendían en 1902, los bienes representados por la acciones), se consideran como "tributables a la corporación" dentro del significado del artículo 291(d), trayendo como resultado una exención de contribución de las acciones en manos de los accionistas.

■ El Tesorero tiene otra teoría en cuanto a la interpretación correcta del artículo 317, no enteramente consistente con la ya discutida. Los empleados del Tesorero declararon en el Tribunal de Contribuciones que empezando con el año fiscal de 1945–46, hablando en términos generales, la política del Tesorero al cobrarle a las corporaciones la contribución sobre la propiedad ha sido tasar a las corporaciones no-bancarias sobre el valor físico de su propiedad, siempre y cuando rindiesen planillas. Para las corporaciones que no las rendían, se usa el capital según éste aparece en los archivos de la Secretaría Ejecutiva, como la medida de la valoración de los bienes muebles "para que no se quedaran sin tributar las corporaciones que por negligencia no rindieran planillas." En cuanto a las acciones en manos de los accionistas, se les impone a las mismas contribución sobre la propiedad si la corporación paga la contribución sobre la propiedad sobre el valor físico de los bienes, pero no si la corporación paga sobre el valor del capital.

A base de este testimonio, el Tesorero arguye y el Tribunal de Contribuciones convino en que la contribuyente no había probado que caía dentro de la exención para las acciones establecida por el artículo 291(d). El tribunal resolvió que "por el contrario la evidencia ofrecida fué a los efectos de que el Tesorero de Puerto Rico tasó contribución de propiedad tan sólo sobre las acciones de corporaciones domésticas cuando a dichas corporaciones se les hubiese tasado el

impuesto territorial sobre el valor físico de sus propiedades.''
Si bien no lo dijo expresamente, el Tribunal de Contribucio-
nes aparentemente convino con el criterio del Tesorero, com-
prendido en esta nueva política, al efecto de que si la corpora-
ción pagaba su contribución sobre la propiedad, tomando como
medida el capital (*capital stock*), etc., las acciones en manos
de los accionistas estaban exentas.

Existen dos defectos fatales en esta política del Teso-
rero y en la decisión del Tribunal de Contribuciones soste-
niéndola en efecto. En primer lugar, el artículo 317 no
autoriza al Tesorero a su discreción a seleccionar el valor
físico de la propiedad de una corporación como medida para
determinar la contribución sobre la propiedad de la corpora-
ción. Por el contrario, el artículo 317 expresamente requiere
del Tesorero que use (1) el valor físico de la propiedad *o*
(2) el valor del "capital" más ciertas partidas que se enu-
meran, cualquiera que sea mayor. El Tesorero no puede,
haciendo caso omiso de las claras disposiciones del artículo
317, echar a un lado la valoración mayor del capital, etc., y
arbitrariamente usar el valor físico de los bienes en cada
caso, únicamente para evitarse la exención para las acciones
bajo el artículo 291(*d*). En verdad, si el estatuto le hubiera
conferido al Tesorero tan absoluta discreción, cosa que no
ocurre aquí, para elegir entre las dos alternativas, con la
exención para las acciones emanando de una y· la tributación
de la otra, habría serias dudas en cuanto a su constitucio-
nalidad. *P. R. & Am. Ins. Co.* v. *Gallardo, Tes.*, supra,
920–21, 930–31.

En segundo lugar, el Tesorero y el Tribunal de Con-
tribuciones están equivocados en cuanto al efecto que tiene el
calcular la contribución sobre la propiedad de una corpora-
ción, a base del valor físico de sus bienes, sobre la tributa-
ción de las acciones en manos de sus accionistas. Por moti-
vos que ya hemos expuesto, no importa cuál de las dos
alternativas comprendidas en el artículo 317 sea usada, las

acciones de una corporación doméstica están exentas si ésta paga la contribución sobre la propiedad de conformidad con los artículos 316–17.

Finalmente, una indicación de la debilidad de esta teoría del Tesorero es el resultado anómalo a que nos lleva. Simplemente dejando de radicar su planilla, una corporación le podría conceder a sus accionistas una exención contributiva sobre sus acciones. Aparte de su dudosa constitucionalidad, no creemos que la Legislatura tuvo la intención de conferirle al Tesorero o al contribuyente el derecho de elegir si la propiedad estaría sujeta a contribución o no.(⁷)

Un examen de los artículos 291(d) y 316–17, al leerse a la luz de la filosofía prevaleciente en 1902 y de las leyes estatales que sirvieron de modelo para estos artículos, nos ha llevado a la conclusión de que la Legislatura tuvo por miras imponer contribución a las acciones en manos de los accionistas o a la propiedad en manos de la corporación, pero no a las dos. Una disposición relacionada del artículo 291(d) indica el mismo resultado. Los bienes de ciertas corporaciones están exentos de contribución a tenor con el artículo 291(e). Siguiendo el criterio de entonces de que las acciones en manos de los accionistas representan esta propiedad, y para hacer efectiva esta exención de la propiedad de la corporación, el artículo 291(d) exime las acciones de tales corporaciones en manos de sus accionistas.

De igual manera el artículo 317, al requerir la deducción del valor de los bienes inmuebles del valor del "capital" de la corporación al medirse por el capital en acciones más

---

(⁷)El Tribunal de Contribuciones finaliza su opinión como sigue: "Ante nos no ha sido planteada, ni al través de las alegaciones ni de la prueba, si el querellado no ha actuado de acuerdo con las disposiciones del artículo 317 del Código Político." No estamos conformes. Por el contrario, como ya se ha indicado, la prueba demuestra que el Tesorero erróneamente trató bajo el artículo 317 de usar el valor físico de la propiedad como la medida de la contribución sobre corporaciones no bancarias que radicaron planilla, en vez de seleccionar la cifra más alta provista por las dos alternativas, según lo requiere el artículo 317. Además, esta cuestión se argumenta en detalle en los alegatos sometidos al Tribunal de Contribuciones por la contribuyente y por el *amicus curiae.*

otras partidas, demuestra la intención de la Legislatura de evitar imponer contribuciones a los bienes inmuebles de una corporación, dos veces, hablando en términos económicos.

Este mismo propósito de evitar lo que la Legislatura de 1902 creyó que era doble contribución económica, también surge del artículo 320. Provee dicho artículo que las corporaciones extranjeras que hacen negocios en Puerto Rico, con excepción de las instituciones bancarias con capital en acciones, serán tributadas en la misma forma que las corporaciones domésticas, excepto que "para determinar el valor real y efectivo, a la sazón, del *capital* de tales corporaciones sólo se tendrá en cuenta y valuará aquella parte del *capital* que tengan ellas empleado en la transacción de negocios en Puerto Rico; pero la cantidad de dicho capital no será, en ningún caso, menor que el valor de la propiedad inmueble y mueble ubicada en Puerto Rico . . . ". (Bastardillas nuestras). Nuevamente aquí el "capital" de corporaciones extranjeras usado aquí o sus bienes ubicados en Puerto Rico, el mayor de los dos, es tributado, pero no ambos.

Esto es también manifiesto en relación con los bancos. El artículo 320 finaliza con una disposición al efecto de que todas las acciones de corporaciones bancarias domésticas y extranjeras radicadas o haciendo negocios en Puerto Rico serán tasadas a los dueños de las mismas en los distritos municipales donde se encuentren dichos bancos, con una deducción por el valor proporcional de la propiedad inmueble perteneciente al banco. Éste deberá pagar esta contribución. Sin embargo, tiene derecho a que el accionista le reembolse, y tiene por ello un gravamen sobre sus acciones. Toda vez que la propiedad, capital o capital en acciones (todos sinónimos a nuestros fines) de una corporación bancaria están exentos de contribuciones bajo el artículo 320, los bienes de bancos, representados por sus acciones, se le tributan a los *accionistas;* pero se deduce el valor de la propiedad inmueble perteneciente al banco. Una vez más, la Legislatura evitaba

imponer dos veces contribución a lo que entonces consideraba desde el punto de vista económico que era la misma cosa—propiedad del banco frente a las acciones de sus accionistas. Esa podría ser la única razón por la cual permitió a un *accionista* deducir de *su* contribución el valor de la propiedad inmueble perteneciente al *banco*.

Encontramos la misma situación en el artículo 321, que provee la imposición de contribuciones a las compañías de ferrocarril. Fija el método de tasar sus propiedades; pero finaliza con una disposición al efecto de que para determinar el valor de las "acciones del capital" de tales compañías, se deducirá el valor físico de sus bienes.

El artículo 322 es un poco más difícil de interpretar y por consiguiente no nos basamos mucho en él. *Cf. P. R. & Am. Ins. Co.* v. *Gallardo, Tes.,* supra, págs. 924-25, con la opinión disidente de dicho caso, a las págs. 934, 944-45. Notamos que el mismo provee que las contribuciones impuestas por el Título IX "sobre acciones, capital y propiedad" de corporaciones y sobre acciones de bancos dedicados a negocios en Puerto Rico, serán pagaderas al Tesorero, quien entregará la parte proporcional de dichas contribuciones a los municipios. También provee que tales corporaciones "quedan . . . autorizadas para retener las contribuciones correspondientes sobre acciones del capital, de las ganancias o dividendos que se deriven a favor de los accionistas, o a cancelar una parte de dichas acciones, suficiente para pagar las citadas contribuciones."

La contribuyente sostiene que la disposición del artículo 322 para que se retenga y pague "las contribuciones correspondientes sobre acciones del capital" quiere decir aquella proporción correspondiente a cada accionista de la contribución impuesta al "capital" de la corporación por el artículo 317. Este concepto es, desde luego, enteramente extraño a las ideas modernas, que trazan una marcada distinción entre una contribución a una corporación y una contribución sobre

sus accionistas. Pero la peticionaria arguye que ésta era la idea de la Legislatura de 1902, que trataba a los accionistas—no a la corporación—como los dueños del activo de ésta, y consideraba una contribución sobre la propiedad de la corporación como una contribución sobre las acciones, cobrable empleando a la corporación como precursora del moderno agente retenedor.

Esto haría posible a las corporaciones exigirle a sus accionistas que les reembolsen por las contribuciones pagadas bajo el artículo 317 por dichas corporaciones sobre los bienes de la misma. Creemos que es innecesario en este caso considerar dicho punto y en consecuencia no pasamos sobre el mismo.[8]

Expuesto brevemente, el tema que impera en estos artículos es que (1) cuandoquiera que la Legislatura vislumbró la tributación de acciones, las consideró como que representaban bienes de la corporación, no empece el hecho de que las acciones fueran tributadas en manos de los accionistas; y (2) que fué su intención tributar acciones propiamente dichas en manos de los accionistas, solamente si la corporación no venía obligada a pagar contribución sobre sus bienes, ya fuere conocida como una contribución sobre los bienes o una contribución medida por su "capital" o "capital en acciones". Es decir, que la Legislatura tenía y tiene el poder legal de imponer contribución tanto a la propiedad de la corporación como a las acciones en manos de sus accionistas; por motivos económicos y no legales, optó en 1902 por imponerle contribución a una sola.

Seguidamente convenimos en que, al eximir las acciones, el artículo 291(d) no articula el tema que acabamos

[8] De igual manera dejamos para otra ocasión el problema que surge del hecho de que en la versión inglesa la coma después de la palabra "capital" en la frase "upon capital, shares and property" en la primera parte del artículo 322 fué insertada por la enmienda del 1904; no aparece en la versión de 1902. Por otro lado, la Legislatura no insertó una coma en la frase "capital shares" según ésta aparece en la última parte del artículo 322.

Véase también, el escolio 2.

de exponer en un lenguaje absolutamente inequívoco. En verdad, de haberlo hecho, nunca habría surgido este caso. Pero las ideas son prisioneras del lenguaje que las expone. Y son muy raras las ocasiones en que abogados sagaces no pueden encontrar algún apoyo para interpretaciones contradictorias de complicadas leyes contributivas. Sin embargo, estamos convencidos de que (1) la Legislatura tuvo por miras mediante el artículo 291(d) eximir las acciones cuando la corporación pagaba la contribución sobre la propiedad; y (2) que empleó lenguaje razonablemente claro, si bien inapropiado, en el artículo 291(d) y artículos relacionados para expresar su intención. Por tanto es nuestro deber interpretar el estatuto en forma tal que cumpla con este propósito de la Legislatura. Al así resolver estamos siguiendo la doctrina establecida en *Rullán* v. *Buscaglia*, 168 F.2d 401, 403 (C.C.A. 1, 1948).(⁹)

Nuestros primeros casos no arrojan mucha luz sobre la cuestión envuelta aquí. *Union Cen. Life Ins. Co.* v. *Tesorero*

---

(⁹)Luego de citar el artículo 19 del Código Civil, ed. de 1930, la Corte de Circuito a la pág. 403 cita el lenguaje del Juez Holmes, actuando en el Primer Circuito, en el caso de *Johnson* v. *United States*, 163 F. 30, 32 (C.C.A. 1, 1908) como sigue: "La Legislatura tiene el poder de decidir cuál va a ser la política de la ley,' y si ha insinuado su deseo, aun indirectamente, dicho deseo debe ser reconocido y obedecerse. La premisa mayor de la conclusión expresada en una ley, el cambio de política que induce a su aprobación, puede ser que no se expongan específicamente, pero las cortes no cumplen adecuadamente su deber si dicen: *Vemos lo que se tiene en mente, pero usted no lo ha dicho así, y por tanto seguiremos como antes."* (Bastardillas nuestras).

La corte también cita con aprobación al Juez Learned Hand en el caso de *Federal Deposit Ins. Corporation* v. *Tremaine*, 133 F.2d. 827, 830 (C.C.A. 2, 1943): "No hay guía más segura en la interpretación de una ley que su propósito cuando éste surge suficientemente; tampoco hay mejor prueba de que no se quiere cumplir dicho propósito aduciendo como excusa que el lenguaje de la ley no se ajusta formalmente al propósito." Y en *Cabell* v. *Markham*, 148 F.2d 737, 739 (C.C.A. 2, 1945): "Desde luego es cierto que las palabras empleadas, aun en su sentido literal, son la fuente primordial, y de ordinario la más confiable, de interpretar el significado de cualquier escrito: bien sea éste un estatuto, un contrato, o cualquier otra cosa. *Pero es uno de los indicios más seguros de una jurisprudencia madurada y desarrollada el no construir una fortaleza con un diccionario;* sino recordar que las leyes siempre tienen algún propósito u objeto por cumplir, cuyo descubrimiento no hostil e imaginativo es el camino más seguro a su significado." (Bastardillas nuestras).

*de P. R.,* 19 D.P.R. 900, y *Fajardo Sugar Co.* v. *Tesorero de P. R.,* 22 D.P.R. 311, confirmado en 237 Fed. 195 (C.C.A. 1, 1916), no envolvían la tributación de acciones ni su exención del pago. Resolvieron, con el voto disidente del Juez Del Toro, que en virtud de la enmienda de 1904 al artículo 290, los créditos personales e hipotecarios estaban exentos del pago de contribuciones. En cuanto al problema específico ante nos, la única ayuda es el siguiente comentario a la página 320 del caso de *Fajardo:* ''La Legislatura teniendo presente que toda la propiedad material es tasada puede que haya querido evitar una tasación sobre los derechos a la propiedad con el fin de impedir la doble tasación que tan frecuentemente recae sobre el mismo comodatario en vez de sobre la persona que tiene el crédito.'' Al mismo efecto, véase el lenguaje de la opinión disidente, a la pág. 333. Esta conviene con nuestro criterio de que la pauta seguida consistentemente en el Código Político de 1902, según fué enmendado en 1904, fué imponer la contribución sobre la propiedad una sola vez sobre lo que la Legislatura creía entonces que era la misma cosa, hablando en términos económicos.

El caso de *P. R. & Am. Ins. Co.* v. *Gallardo, Tesorero, supra,* se acerca un poco más a nuestro problema. En él resolvimos que la propiedad mueble de una corporación doméstica, consistente en créditos hipotecarios, pagarés y *acciones* de otras corporaciones, no estaba sujeta al pago de contribuciones por la corporación. La mayoría del tribunal centralizó su atención hacia el punto de si la contribución era una sobre la propiedad o un arbitrio, y resolvió que era una contribución sobre la propiedad. Las partes admiten, y convenimos con ellas, en que la opinión era claramente correcta sobre dicha cuestión. Pero la mayoría de la corte no vió los únicos puntos sustanciales en el caso; es decir, (1) si los créditos estaban exentos bajo el artículo 290 y

(2) si las acciones, en manos de la contribuyente, estaban exentas bajo el artículo 291 (d).([10])

Sin embargo, no obstante estos errores de omisión de parte del tribunal, algunas de sus observaciones eran correctas y de conformidad con nuestros puntos de vista aquí expuestos. En primer lugar, como hemos indicado, manifestó a las páginas 920–21 y 930–31 que de acuerdo con el artículo 317 el Tesorero no tiene opción; al elegir entre las dos alternativas provistas en el mismo para valorar la propiedad mueble, venía obligado a elegir el método que rindiera la valoración mayor. En segundo lugar, convenimos en que (pág. 921) "fué la intención de la legislatura imponer contribuciones sobre propiedad tangible o *sobre la propiedad inmueble que la representara,* según se expone particularmente en el artículo 317 y también que no había intención de hacer la valuación una medida para otra cosa que no fuera *una contribución sobre el capital de la corporación según estaba representado por sus bienes.*" (Bastardillas nuestras). En tercer lugar, correctamente se dice que (pág. 925) "en Puerto Rico solamente se han impuesto contribuciones sobre acciones [de corporaciones domésticas] de bancos e instituciones bancarias." Finalmente, si bien ése no sería quizá el enfoque hoy día, anticipó nuestro criterio actual de lo que se pensaba en 1902 en el siguiente lenguaje a las págs. 929–30: "Cuando un estado desea imponer una contribución tanto a

([10]) Solamente el Juez Presidente Sr. Del Toro vió el punto. Disintió por el siguiente fundamento (pág. 934): "El Tesorero no cargó contribución alguna a los bienes exentos por ministerio de la ley. Tomó en consideración el valor de las acciones que es algo independiente susceptible de tasación de acuerdo con una interpretación racional del artículo 317 del Código Político." Si bien no estamos conformes con su conclusión, el Juez Presidente Del Toro, contrario al resto del tribunal, aparentemente se dió cuenta de la naturaleza del problema.

El Juez Asociado Franco Soto también disintió: pero su opinión disidente fué predicada en la teoría de que el caso envolvía una contribución sobre franquicia y no sobre la propiedad. Según convienen las partes en este caso, esto era patentemente erróneo, y la mayoría estaba correcta al repudiar el caso de *France and N. Y. Medicine Co.* v. *Reily et al.,* 31 D.P.R. 650, en tanto este último caso expresó el criterio de que la contribución en cuestión es un arbitrio más bien que una contribución sobre la propiedad.

una corporación como a sus accionistas, la intención debe ser claramente manifestada. De lo contrario las cortes interpretarán que el estatuto significa una de dos cosas, bien una contribución a la corporación o una contribución a los accionistas. No se interpretará que los estatutos autorizan que se impongan contribuciones tanto a la propiedad de corporaciones como a los accionistas, a menos que sea clara la intención de hacerlo así. *Tennessee* v. *Wentworth,* 117 U.S. 129, 134; *New Orleans* v. *Houston,* 119 U.S. 265, 277; *Loring* v. *Beverly,* 222 Mass. 331; *Board, etc.,* v. *Ryan,* 232 Pac. 834, y casos; 26 L.R.A. 158.''

En reconsideración, este tribunal se dió cuenta de que en su opinión original no había resuelto las cuestiones realmente envueltas en el caso; v.g., si (1) las acciones y (2) los créditos hipotecarios estaban exentos. Si bien procedimos a considerar estos dos puntos, erramos en cuanto a ambos. La corte resolvió con respecto al primero lo siguiente: ''Convenimos con el gobierno en que no se demostró que los $11,850 en acciones de corporaciones estuvieran exentos de contribución. El artículo 291(*d*) del Código Político exime de contribución las acciones del capital de otras corporaciones cuando la propiedad de tales corporaciones esté exenta o cuando dichas corporaciones estén sujetas al pago de contribuciones por tales acciones. La apelante no demostró entonces que sus acciones estuviesen exentas de contribución en una u otra forma.'' *Porto Rican & Am. Ins. Co.* v. *Gallardo,* 37 D.P.R. 114, 115–16. Y citando el artículo 291(*m*), dijimos que los créditos hipotecarios de manera similar no estaban exentos. Como éstos eran los resultados defendidos por el Juez Presidente Del Toro y el Juez Asociado Franco en sus opiniones disidentes originales, ambos concurrieron en la opinión en reconsideración.

Este tribunal, todavía dejando de darse cuenta de que erró en la reconsideración del caso de *P. R. & American* al resolver que los créditos pertenecientes a una corporación

no estaban exentos del pago de contribuciones, unánimemente llegó a la misma conclusión en el caso de *P. R. Coal Co.* v. *Gallardo,* 39 D.P.R. 637. Sin embargo, este último caso fué revocado en *Porto Rico Coal Co.* v. *Domenech,* 41 F.2d 183 (C.C.A. 1, 1930). La Corte de Circuito se basó en nuestras opiniones anteriores en sentido contrario en los casos de *Union Central Life* y *Fajardo,* y en su confirmación de este último.(¹¹)

Antes de que la Corte de Circuito hubiera emitido su decisión en el caso de la *P. R. Coal Co.,* repetimos el error ya cometido en la reconsideración de *P. R. & American Ins. Co.,* con respecto a la tributación de acciones de corporaciones domésticas en manos de los accionistas. El Juez Presidente Sr. Del Toro escribió una opinión unánime para la Corte a ese efecto en *Caribbean Casualty Co.* v. *Gallardo, Tes.,* 40 D.P.R. 679. Este es el caso citado aquí por el Tesorero con mayor énfasis. Es innegable que el Juez Pre-

---

(¹¹)La Corte de Circuito dijo lo siguiente en 41 F.2d 183, a la pág. 185; "Esta corte siempre le dará debida consideración a la interpretación de un estatuto local por una corte local de última instancia, pero cuando, como en este caso, ya se ha aprobado una interpretación del artículo 317 por la Corte Suprema de Puerto Rico, esta corte no puede, si es que las decisiones en apelación van a ser de algún provecho, seguir cada nueva interpretación de este artículo por parte de la corte de Puerto Rico. Aquí no se presenta razón adecuada alguna para revocar nuestra anterior decisión."

Esta manifestación no se ajusta a decisiones más recientes de la Corte Suprema de los Estados Unidos y de la propia Corte de Circuito. Los últimos casos establecen la regla de que nuestro más reciente caso, si bien inconsistente con los casos anteriores, es decisivo sobre cuestiones locales, a menos que sea "inescapablemente erróneo". *De Castro* v. *Board of Comm'rs.,* 322 U. S. 451; *Ballester-Ripoll* v. *Court of Tax Appeals of P. R.,* 142 F. 2d 11, 17 (C.C.A. 1, 1944) *cert.* denegado, 323 U. S. 723; *Torres* v. *Roldán,* 67 D.P.R. 367, 370–71; *Pérez Segovia* v. *Tribunal de Distrito,* 69 D.P.R. 4, 7–8. Sin embargo, eso no afecta el resultado aquí, porque esta Corte, según aparece del texto de esta opinión, posteriormente revirtió al criterio expresado en los casos de *Union Central Life* y *Fajardo* en cuanto a la exención de créditos.

También notamos de paso que la Corte de Circuito dice en 41 F.2d a la pág. 186 que nuestra opinión en reconsideración en el caso de *P. R. & American Ins. Co.* no es inconsistente con los casos anteriores de *Union Central Life* y *Fajardo.* Esta manifestación de la Corte de Circuito es errónea; pero por motivos ya expuestos, no afecta la conclusión a que final y correctamente llegamos en cuanto a la exención de créditos.

sidente Del Toro fué el único consistente a través del giro que tomáron nuestros casos. Pero la mayoría de la corte no estaba con él, excepto en los casos de *P. R. & American. Ins. Co.* (en reconsideración) y de *Caribbean Casualty Co..* Y estos dos casos fueron decididos antes de que la Corte de Circuito nos señalara nuestro error al eximir los créditos. Además, dicho error fué particularmente serio, a nuestros fines, porque esta Corte y la Corte de Circuito en el caso de la *P. R. Coal Co.* y en otros mezclaron acciones con créditos y los trataron como si ambos estuviesen gobernados por la misma regla bajo el artículo 290. Ellos son, desde luego, cosas completamente diferentes, y son tratados diferentemente bajo el Código Político: los créditos están totalmente exentos (artículo 290); las acciones están exentas en manos de los accionistas únicamente cuando "dichas acciones sean tributables a dichas corporaciones" (artículo 291(*d*)). Finalmente, como hemos visto, las escuetas manifestaciones en las opiniones de *P. R. & American Ins. Co.* (en reconsideración) y *Caribbean Casualty Co.* al efecto de que la contribuyente no había demostrado que sus acciones caían bajo dicha exención, bajo las circunstancias de estos casos, no pueden ser aceptadas. Por el contrario, como ya se ha indicado en nuestro análisis de los artículos pertinentes, el estatuto nos compele a concluir que en 1902 la Legislatura tuvo por miras mediante el artículo 291(*d*) eximir las acciones de una corporación doméstica cuando ésta paga contribuciones sobre su propiedad o sobre su "capital" según lo proveen los artículos 316–17.

Después de haber la Corte de Circuito revocado nuestra opinión en el caso de *P. R. Coal Co.,* nos dimos cuenta del error que habíamos cometido al reconsiderar el caso de *P. R. & American Ins. Co.,* y restablecimos la regla correctamente enunciada en los casos de *Union Central Life* y *Fajardo* resolviendo que los créditos están exentos. *New Corsica Cen-*

142

*trale* v. *Gallardo, Tesorero,* 41 D.P.R. 669.([12]) En este caso el Juez Presidente Del Toro radicó una opinión concurrente en la que finalmente abandonó su oposición a la exención de los créditos, obligado por la opinión de la mayoría y la confirmación de ésta por la Corte de Circuito. Pero insistió en que las opiniones unánimes de *P. R. & American Ins. Co.* en reconsideración y *Caribbean Casualty Co.* todavía representaban la ley *en cuanto a la imposición de contribuciones sobre acciones del capital.* Aquí, sin embargo, encontramos significativo el hecho de que aparentemente el Juez Del Toro hablaba únicamente por sí, y no a nombre de ninguno de los otros jueces que entonces constituían el tribunal. Y, por motivos aquí expuestos, no compartimos ahora sus puntos de vista individuales.

Resta sólo por indicar que en los casos de *Cortada* v. *Municipio de Ponce,* 47 D.P.R. 615, y *Buscaglia, Tes.* v. *Tribunal de Contribuciones,* 65 D.P.R. 120, ratificamos la regla de que los créditos están exentos. En el último dijimos a la página 125, citando a la Corte de Circuito en el caso de *Porto Rico Coal Co.,* 41 F.2d 183, 186, que si esta regla, comprendida en nuestra legislación, "no es satisfactori[a] al Pueblo de Puerto Rico, éste tiene una legislatura con autoridad para enmendarl[a]." Hacemos el mismo comentario en relación con la exención de acciones de una corporación doméstica en manos de sus accionistas.

El examen que hemos hecho de la cuestión nos ha disipado toda duda sustancial en cuanto a cuál fué la intención de la Legislatura. Además, la práctica administrativa del Tesorero refuerza nuestra conclusión. Las partes estipularon que entre los años 1926–27 y 1944–45 no se tasaron acciones de corporaciones domésticas en manos de individuos o de otras corporaciones. De existir alguna duda sustancial en nuestras mentes sobre si el artículo 291(*d*), al leerse conjun-

---

([12])La corte explicó este error diciendo a la pág. 674 que la contribuyente no radicó alegato en oposición a la moción del Tesorero para que se reconsiderara la opinión original en el caso de *P. R. & American Ins. Co.*

tamente con los artículos 316–17 y otros artículos más, le confería una exención a las acciones de corporaciones domésticas en manos de sus accionistas, ésta se habría desvanecido por dicha práctica administrativa del Tesorero. *Puerto Rico Ilustrado* v. *Buscaglia, Tes.*, 64 D.P.R. 914, 935–38; *Pyramid Products* v. *Buscaglia, Tes.*, 64 D.P.R. 828.

El Tesorero arguye primeramente que esta práctica administrativa era contraria a derecho. *Cf. Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269, 274–75, y casos citados. Pero estamos conformes en que dicha práctica estaba de acuerdo con el estatuto. Sostiene en segundo lugar el Tesorero, citando *Kessler* v. *Strecker*, 307 U.S. 22, 33, que la práctica administrativa no era contemporánea, uniforme y continua. En apoyo de su argumento, cita los casos de *P. R. & American Ins. Co.* y *Caribbean Casualty Co.*, que envolvían contribuciones para los años 1922–23 y 1924–25, respectivamente, en los cuales como hemos visto, se trató de cobrar contribución sobre tales acciones porque éstas fueron erróneamente mezcladas con los créditos. Pero una golondrina no hace verano. Un contribuyente no puede establecer una práctica administrativa en esta forma. De igual modo, habiendo estipulado que la referida práctica administrativa existió durante veinte años, difícilmente puede el Tesorero cuestionar ahora su contemporaneidad, uniformidad y continuidad citando dos casos aislados que se litigaron sobre una teoría doblemente errónea.

 Queda sólo por resolver una cuestión de menor importancia con respecto a 150 acciones de la Compañía Ferroviaria de Circunvalación de Puerto Rico, valoradas en $750, y ocho bonos hipotecarios de la Iglesia Católica, Apostólica, Romana de Puerto Rico, valorados en $800. El Tribunal de Contribuciones denegó el remedio en cuanto a estas partidas por el fundamento de que la peticionaria no había probado en forma "adecuada, fehaciente" que era dueña de estas acciones y bonos. Dijo el Tribunal: "La sola declaración

de uno de los oficiales de la apelante, de memoria, sin más, no es suficiente para probar su contención. *Cf. A. Fernández Hno.* v. *Tribunal de Contribuciones,* 66 D.P.R. 603 (1946). Ello se hace más obvio aún, cuando el testigo ofrecido para probar dicho extremo manifestó que los certificados de acciones estaban guardados en la caja fuerte de la querellante. No hay duda de que ella pudo haber presentado la mejor evidencia y optó por no hacerlo. Es al contribuyente al que compete demostrar, con prueba fehaciente, indubitable y que no deje lugar a dudas, su derecho a una exención contributiva.''

En cuanto a las acciones del ferrocarril, el Tesorero admitió en su contestación que la peticionaria era dueña de 150 acciones, y el Tribunal de Contribuciones dijo durante la vista, ''No está en *issue* el que la querellante posea 150 de esas acciones.'' En su consecuencia erró el tribunal como cuestión de derecho al no resolver que dichas acciones eran de la peticionaria.

En cuanto a los bonos hipotecarios, convenimos con el Tribunal de Contribuciones en que la mejor evidencia hubiera sido los propios certificados. Pero el tribunal admitió el testimonio del Presidente de la peticionara al efecto de que ella era dueña de estos bonos. Este testimonio no fué contradicho. En verdad, fué la única prueba que se presentó sobre esta cuestión. Habiéndola admitido, el tribunal no podía refugiarse en la regla de la mejor evidencia. Su deber era o darle crédito o rechazarla por increíble. El Tesorero no arguye aquí que el Presidente de la corporación cometiera perjurio, o aun que se equivocara en su declaración. Como cuestión de hecho, a menos que la contribuyente sea la dueña de estos bonos, es obvio que no se adeuda contribución alguna sobre los mismos. Bajo estas circunstancias, está justificada nuestra conclusión de que el Tribunal de Contribuciones erró, como cuestión de derecho, al resolver que no se presentó prueba válida al efecto de que la peticionaria era la dueña

de estos bonos. Añadimos que el caso de *A. Fernández Hno. & Cía.* v. *Tribunal de Contribuciones* envolvía un problema enteramente diferente.

*La sentencia del Tribunal de Contribuciones será revocada y se dictará nueva sentencia resolviendo que las acciones de corporaciones domésticas y los bonos hipotecarios de la iglesia de los cuales la peticionaria es dueña, están exentos del pago de contribución sobre la propiedad.*

El Juez Asociado Sr. Negrón Fernández se inhibió.